**UNITED STATES of America, Plaintiff,**

v.

**Maxwell FREYMULLER, Defendant.**

**No. 82 CR 789.**

United States District Court,
N.D. Illinois, E.D.

June 2, 1983.

**62**

Ira Raphelson, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Edward H. Genson, Chicago, Ill., for defendant.

## MEMORANDUM DECISION

GRADY, District Judge.

The defendant, Maxwell Freymuller, is charged with unlawful possession of cocaine[1] found in a search of his luggage at O'Hare Airport in Chicago on November 3, 1982. He has moved to suppress the evidence found in his luggage as well as certain evidence obtained from him when he was interviewed by police officers prior to the search of his luggage. The defendant testified in support of his motion, and two Chicago police officers, Richard Boyle and Rosemary Burzinski, testified in opposition.

Officers Boyle and Burzinski testified that at 2:00 p.m. on November 3, they were watching the passengers who arrived on Flight 650 from Tampa, Florida, a known "source city" for narcotics.[2] These officers were in plainclothes and their guns were not visible. Officer Boyle noticed defendant as he left the jetway leading from the plane and saw that defendant "looked cautiously around at the people in the concourse area." Officer Burzinski did not observe this. The defendant testified that he had no recollection of looking around and that as far as he knows he displayed no signs of nervousness. Defendant was carrying a briefcase. He started down the concourse toward the baggage area in the main terminal, and the two officers fell in step behind him. Boyle stated that the defendant did not appear nervous as he walked down the corridor.

After defendant had proceeded a short way, the two officers overtook him. Boyle said, "Excuse me, I'm a police officer. Would you mind speaking to me for a few minutes?" Both officers displayed their badges. The defendant replied "Okay." Boyle motioned the defendant over toward the corridor wall, where there were some newspaper vending machines. He testified that his purpose was to have a convenient place for a search of defendant's briefcase. From previous experience (both Boyle and Burzinski are veteran members of the O'Hare Narcotics Task Force), he had learned that the top of the machine makes a convenient table on which to place items being searched.

Defendant testified that at this point Boyle said the officers had information that someone meeting defendant's description was transporting a large amount of narcotics from Tampa, and asked defendant for his identification. The officers agree that they asked defendant for his identification, but deny that anything was said about defendant meeting the description of someone carrying narcotics. The officers testified that they had no such information. Officer Boyle testified on cross examination that the police occasionally do receive tips of this kind and in those situations they will sometimes confront the suspect with the information.

In response to the request for identification, defendant produced his driver's license, which was in his own name, Maxwell Freymuller. Officer Boyle asked defendant if he had an airline ticket, and defendant replied that he did not. Defendant says that the officers then asked for permission to search his briefcase, which he

---

1. 21 U.S.C. 841(a)(1).

2. Officer Boyle stated on cross-examination that *any* city in southern Florida is considered a "source city."

granted. The officers searched the briefcase and found nothing that was incriminating. Everyone agrees that defendant asked whether he was under arrest, and the officers said no. Defendant did not specifically ask, nor was he told, whether he was free to go. Defendant testified that he then asked what the problem was, and the officers said they had a description of someone with blond hair carrying a briefcase and a large amount of narcotics. According to defendant, the officers then asked him again for his airline ticket, and he produced it. The ticket was in the name of "S. Rice."

The officers' version is that defendant produced the airline ticket before the search of the briefcase. Their testimony is that immediately after he produced his driver's license the defendant first denied that he had a ticket, then admitted that he did have one and produced it. Then the search of the briefcase occurred. Again, the officers deny that they said anything about a person carrying narcotics.

Defendant testified that even though he was told that he was not under arrest, he did not feel free to go. He stated that throughout the encounter the officers were positioned so that they blocked his way. The officers denied that they were blocking the way and testified that defendant was left a clear path down the concourse.

Officer Boyle testified that when he produced his airline ticket the defendant was breathing rapidly and his voice was trembling. Officer Burzinski testified that defendant was sniffing and shaking. Defendant denies that he was trembling or sniffing.

After the ticket was produced, the officers asked defendant whether he had any other luggage besides his briefcase. Defendant answered that he did not. The officers noted, however, that there was a baggage stub stapled to defendant's ticket. Officer Burzinski wrote down the baggage stub number before handing the ticket back to the defendant.

The interview ended at that point and defendant continued down the concourse. He testified that the encounter lasted seven to ten minutes. Officer Boyle testified that it lasted three to five minutes.

What happened thereafter is not in dispute. Defendant engaged in a number of highly suspicious maneuvers in an obvious effort to throw the officers off his trail before claiming his checked luggage. The officers, using the number on the baggage stub, found defendant's suitcase in the baggage area and presented it, along with a number of other suitcases, to the now familiar U.S. Customs Service sniffing dog. The officers state that the dog "alerted positively" for the presence of narcotics in the bag. On the basis of all this information, the bag was held until a search warrant could be obtained. A search of the bag pursuant to the warrant revealed approximately 9 ounces of a mixture containing cocaine.

## DISCUSSION

■ Defendant agrees that the suspicious circumstances made known to the officers during the initial interview—the discrepancy between the name on the driver's license and the name on the ticket, defendant's initial denial that he even had a ticket and his denial that he had baggage when a baggage ticket was stapled to his ticket—together with defendant's evasive behavior following the interview, amply justified the detention of defendant's luggage for the purpose of having a dog sniff it, since the officers had a reasonable suspicion that the luggage contained contraband. *United States v. Klein,* 626 F.2d 22 (7th Cir.1980). When the dog "alerted" to the bag, there was probable cause for issuance of a warrant. *Id.* at 27. If the information derived from the interview was unlawfully obtained, then it cannot be used to support what occurred thereafter and the evidence found in the suitcase must be suppressed. The issue in this case, therefore, is whether defendant's Fourth Amendment rights were violated by the initial interview in the corridor.

As pointed out in *United States v. Black,* 675 F.2d 129, 133 (7th Cir.1982), "The case

law has developed three tiers or categories of police-citizen encounters." The most highly intrusive, an arrest, requires probable cause to believe that the person has committed or is committing an offense. Defendant does not contend that he was arrested at the time of the initial interview, but he does argue that what occurred was an investigative stop. This second category of encounter

> ... is limited to brief, non-intrusive detention during a frisk for weapons or preliminary questioning; this type of encounter is also considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.

*Ibid.* The third category of encounter is where

> ... no restraint of the liberty of the citizen is implicated, but the voluntary cooperation of the citizen is elicited through non-coercive questioning; this type of contact does not rise to the level of a seizure.

*Ibid.* This is what the government argues occurred here. Alternatively, the government asserts that if some element of coercion did find its way into the interview, it was not until *after* Boyle and Burzinski had already acquired sufficient information to justify an investigative stop, so that any information acquired during the remainder of the interview was lawfully obtained.

The government does not suggest that Freymuller's having come from a "source city" and having "looked cautiously around at the people in the concourse area" would be "specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime," *United States v. Black, supra,* so there is no contention that when the officers accosted defendant they were conducting a lawful investigative stop. The facts did not warrant *any* degree of coercion, and therefore the question is whether any coercion was present. The test as to whether there was coercion—and therefore a "seizure" requiring at least the reasonable suspicion justifying an investigative stop—is whether, under the circumstances shown, "... a reasonable person would have believed he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1979) (Opinion of Stewart, J.); *United States v. Black, supra,* 675 F.2d at 133–34. This question "... is a highly factual one, heavily dependent on the circumstances of each case." *United States v. Black, supra,* 675 F.2d at 134.

■ Before analyzing the circumstances of this case, it is appropriate to note which side has the burden of proof. The government concedes that it has the burden of proving by the preponderance of the evidence that the interview was, at least initially, a non-coercive encounter. Although the actual search of the defendant's luggage took place pursuant to a search warrant, most of the essential facts set forth in the affidavit used to obtain that warrant were derived from the interview with the defendant. It is in reality the evidence obtained in that interview which defendant seeks to suppress, and the case is thus analogous to one in which the government seeks to justify a warrantless search on the basis of consent. In such a case, the government has the burden of proving consent. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *United States v. Sanchez-Jaramillo,* 637 F.2d 1094, 1098 (7th Cir.1980), *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79.

■ The question, then, is whether the government has shown by the greater weight of the evidence that at the time Freymuller was making the incriminating statements and producing the incriminating documents used to obtain the search warrant he should reasonably have believed that he was free to discontinue the interview and go on his way.

The parties agree that the encounter began when the officers identified themselves, showed their badges and asked to speak

with defendant. The defendant replied, "Okay." So far, there was nothing coercive. Officer Boyle then motioned the defendant over toward the vending machines, so that he and Burzinski would have a place to search the defendant's briefcase. The officers, therefore, had already decided that a search of the briefcase was going to occur, or at least that the defendant would be requested to permit a search of the briefcase. This intention on the part of the officers is not necessarily inconsistent with a non-coercive encounter, especially if their intention was not made known to the defendant,[3] but neither is it irrelevant. It would require some effort for a policeman bent upon searching a person's briefcase to convey the impression that the person is perfectly free to refuse. Boyle and Burzinski may not have made the effort, or, if they did, it is possible they were not convincing.

The government emphasizes the fact that the two officers were in plainclothes and did not display any weapons. I fail to see how either of these facts is of much significance. It is common knowledge that many policemen wear civilian clothing and that virtually all police officers, regardless of what kind of clothing they wear, carry guns while on duty. When officers Boyle and Burzinski displayed their badges to defendant they did all that was necessary as a practical matter to notify him that they were persons who had the authority and the means to restrain him if they chose to do so.

The stories diverge at this point. Freymuller says that Boyle told him he matched the description of a person carrying a large quantity of narcotics from Florida and asked for Freymuller's identification. The officers deny this. The point is important. Turning the matter over in Freymuller's mind, or the mind of any reasonable person, it would seem unlikely that the officers would let him simply walk off if indeed he met the description of a person carrying a large quantity of narcotics. If this statement was made by Boyle, it is difficult to

see how Freymuller could reasonably have thought he was free to leave.

There is something missing in the story told by the officers. There is no convincing explanation as to why they stopped Freymuller in the first place. Boyle's claim that Freymuller "looked cautiously around" after alighting from the plane does not satisfy me. It is possible that all persons who carry drugs on airplanes look furtively about when they get off the plane and then glance back over their shoulders repeatedly as they walk down the concourse, but I doubt it. Yet this is the scenario that usually emerges from the government testimony on motions to suppress evidence in these airport search cases. *See, e.g., United States v. Moya*, 704 F.2d 337 (7th Cir.1983), cited by the government:

> The officers observed Ceasar Moya, carrying a shoulder bag, exit the arrival gate and walk several feet in a direction away from the main terminal, whereupon Moya stopped and positioned himself against the wall momentarily, looking in all directions. Moya then walked down the concourse toward the main terminal, frequently looking backwards over his shoulder.... Upon reaching the junction of two concourses, Moya stood off to one side and, again, looked in all directions.

Id. p. 339. In the instant case, Officer Boyle does not claim that Freymuller looked back over his shoulder while walking down the concourse, but merely that he "looked cautiously around at the people in the concourse area" as he left the jetway. The government recognizes that "looking cautiously around" would not be sufficient to justify a *Terry*-type investigative stop,[4] and the purpose of the testimony seems to be to explain why Boyle and Burzinski saw fit to follow Freymuller and initiate a non-coercive encounter with him. I am not persuaded that these officers were prompted to act on so insubstantial a basis. Boyle knew he wanted to search the briefcase

---

**3.** *See United States v. Mendenhall, supra,* 446 U.S. at 554, n. 6, 100 S.Ct. at 1877 n. 6.

**4.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

before he even accosted Freymuller. He had already made plans to put the briefcase on the vending machine, the better to examine it. Freymuller says he was told he matched the description the officers had of a person carrying drugs from Tampa. As between the two explanations for the officers stopping Freymuller—that he was "looking cautiously around" or that he met the description of a suspected drug courier—I find the latter more likely. And if the officers did have such a description, it is not improbable that they would have told Freymuller so. Boyle admitted on cross examination that he sometimes does receive such descriptions and that he has on occasion confronted the suspect with the information.

The next point of dispute is the matter of whether the officers were physically blocking defendant's way. Freymuller gives one account of where the officers were standing, and the officers give another. I am not persuaded that the officers' version is true. Freymuller's testimony was just as credible on this point as that of the officers.

Aside from the simple question of where the officers were standing, it seems to me that another factor weighs in favor of Freymuller's perception that he was being restrained. I refer to the fact that there were two officers, not just one. If all that was intended was a friendly inquiry, terminable at Freymuller's will, one officer would have been enough. The presence of two officers, each displaying a badge, is more consistent with an intention not simply to question Freymuller but to restrain him should he attempt to leave.

The third major point of difference has to do with Freymuller's reaction to the interrogation. The officers testified that when Freymuller produced his airline ticket he was breathing rapidly, his voice was trembling and he was sniffling and shaking. Freymuller denies this. In my view, the government's version helps the defendant much more than his own version. The involuntary behavior described by the officers is obviously indicative of extreme emotional distress. As we know from what developed as Freymuller started producing documents, he was in the process of incriminating himself step by step, and clearly he knew it. His initial denial that he had a ticket was his attempt to curtail an inquiry he knew would lead from bad to worse. The government argues, however, that Freymuller stood there trembling, sniffling and breathing rapidly, turning over one incriminating item after another, all the while knowing that he was perfectly free to leave. This is possible, but it strikes me as unlikely. Freymuller was not desirous of incriminating himself, as we know from the evasive maneuvers he made immediately following his encounter with Boyle and Burzinski. That behavior is inconsistent with the proposition that he had freely submitted to the progressively incriminating interview just a few moments earlier.

The other possibility is that Freymuller is correct and that he was not hyperventilating, sniffling or shaking. While that would lessen the force of the argument that he felt himself under compulsion, it would also destroy the credibility of Boyle and Burzinski. It seems to me, therefore, that this matter of Freymuller's physical symptoms presents a dilemma for the government. There is no indication that the government sees the dilemma, and, in fact, it apparently relies on the evidence of Freymuller's emotional distress as a basis for its theory that the non-coercive encounter evolved into a *Terry*-type stop.[5] It is somewhat ironical that Freymuller, for his part, has not argued that the testimony of the officers concerning his emotional state denotes compulsion. He denies the testimony and obviously regards it as harmful to his case.

Aside from the matter of the government's dilemma, there is the question of which version is in fact more likely true. I find the defendant's version more likely. The description of the rapid breathing, the trembling voice, the sniffling and the shaking seem to me to be a sterotyped descrip-

---

**5.** The description of defendant's physical reactions was set forth in the affidavit for search warrant as part of the showing of probable cause.

tion of how some people would react under stress—perhaps the same people who keep looking back over their shoulders as they hurry down the concourse—but not one that fits my impression of how this defendant would act under stress. Maxwell Freymuller is a 32 year old marine veteran who returned from Viet Nam with two purple hearts. He has a wife, two children and a business in Florida. On the witness stand, he displayed no particular nervousness and testified in a responsive and coherent manner. I believe it is more probable than not that the officers' testimony concerning his reaction to the interview is at least exaggerated.

The citizen who is stopped and questioned by police will in almost every case have only his own testimony to support his version of what happened. The prosecution, on the other hand, will usually have the testimony of at least two police officers, frequently many more than that. The reality of the Fourth Amendment guarantee against unreasonable searches and seizures is ultimately no greater than the willingness of judges to come to grips with sticky questions of credibility. It is essential that judges weigh and analyze the testimony of the police in the same way they do the testimony of any other witness. A story which would meet with skepticism if told by a citizen should receive the same reaction when told by a police officer. Testimony which seems to track the holdings of Supreme Court cases need not be rejected on that account, but neither must it be accepted with the breathless innocence of an ingenue.[6]

The cases which come to court are the ones in which the police-citizen encounter has yielded incriminating evidence. We hear nothing of any encounters where the police were wrong in their suspicions. We hear nothing about instances where the dogs sniffed luggage and did not "alert positively" for the presence of drugs. The cases in which the police play a mere hunch, which is essentially what they claim to have done here, and find nothing as a result of the encounter or the search are cases we never see and whose number would be mere speculation. That they exist, however, seems certain, unless one were to indulge the presumption that the police are infallible in their suspicions.

When the police are told that there is a whole area known as "the non-coercive police-citizen encounter" in which they are free to operate, the possibility of abuse is apparent. Because the question of abuse will arise only in cases where a prosecution ensues, or in the rare case where an aggrieved citizen might file a civil suit for false arrest, the legal environment experienced by police officers is not one that compels or even necessarily encourages circumspection in their contacts with citizens. One danger is that the police will conduct *Terry*-type stops where the facts do not justify it, realizing that they will rarely be called to account in situations where "no harm is done." If such an attitude exists, it is a short step from there to rationalization of the unjustified stops which pay off in the recovery of contraband. It may not be too difficult to recall, after the fact, that the person stopped without an articulable basis for suspicion actually was behaving quite suspiciously before the stop. For instance, looking at the matter in retrospect, wasn't the suspect really looking around quite cautiously as he entered the concourse? Didn't he look back over his shoulder a few times? In the alternative, it would not be too difficult to overlook any threatening aspect of the encounter, so as to justify the argument that the interview was entirely consensual. The pressure on a police officer to make an indictable case when he has recovered contraband must be considerable. The temptation to color the facts to support a prosecution of an individual who, after all, has just been found to be violating the law, is obvious.

---

6. The defendant in *United States v. Mendenhall,* 446 U.S. 544, 547, 100 S.Ct. 1870, 1873 (1979), "... completely scanned the whole area where [the agents] were standing," and, after being accosted "became quite shaken, extremely nervous. She had a hard time speaking." *Id.* at 548, 100 S.Ct. at 1873.

In this case, I am not persuaded that at any time during the encounter the defendant believed he was free to leave. On the contrary, I find that from the time the officers accosted him until they had completed the interview, the defendant believed he was not free to leave and that, under all the circumstances, his belief was reasonable. Accordingly, the statements made by the defendant during the interview and the documents produced by him at that time, as well as the cocaine found in the later search of his suitcase, are all suppressed as evidence.

It is so ordered.