The judgment of the district court will be affirmed.

**UNITED STATES of America**

**v.**

**MASSAC, Jossette, a/k/a Guirand, Josette.**

**Appeal of Josette GUIRAND.**

**No. 88–3618.**

United States Court of Appeals, Third Circuit.

Argued Jan. 24, 1989.

Decided Feb. 9, 1989.

Jeffrey S. Welch (argued), Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for appellant.

William C. Carpenter, Jr., U.S. Atty., Richard G. Andrews (argued), First Asst. U.S. Atty., Wilmington, Del., for appellee.

Before GIBBONS, Chief Judge, and SEITZ, and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Defendant, Josette Guirand, appeals her sentence after conviction by a jury on several counts arising out of her illegal involvement with drugs and related money laundering.

Defendant attacks her conviction on four grounds. She first asserts that the district court erred in denying her motion to suppress evidence of her arrest and the narcotics evidence obtained by the subsequent search of her baggage.

■ We first consider the correctness of the district court's determination that defendant was validly arrested at the Wilmington railroad station. It is indisputably established that an arrest must be based on probable cause. There is probable cause if the facts and circumstances known to the officer warrant a prudent man in the officer's shoes in believing that an offense has been committed. *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

We turn then to the facts and circumstances known to the arresting officer, either prior to or at the time of the arrest in the train station. Most are fairly stated in the Memorandum Opinion of the district court which we quote:

> ... the Wilmington Police had received a tip from Amtrak authorities in Florida, by way of the Drug Enforcement Agency (DEA), that two suspicious individuals had boarded a train in Florida and were scheduled to arrive in Wilmington later in the day. The Amtrak authorities had based their suspicions on several facts. The previous afternoon, two different telephone reservations were made in West Palm Beach, Florida, for tickets to Wilmington. In each case, the callers left the same "contact number" and then paid cash for the tickets. A third telephone reservation was also made using the same contact number, but this ticket was never picked up. Upon calling the contact number, the Amtrak authorities discovered that the residents there had never heard of the names used to make the reservations. These circumstances apparently aroused suspicions of possible drug activities and Amtrak contacted the DEA which in turn notified the Wilmington Police.

> Although the lead was considered a long shot by at least one officer, the Wilmington Police dispatched several detectives to cover the train station. In addition, Detective James Nolan was sent to the station with "K-9 Thor," a specially trained drug-sniffing dog.

When the train from Florida arrived, all the checked luggage, including the blue suitcase belonging to one of the defendants, was subjected to a canine sniff while in the baggage area out of public view. To conduct the canine sniff, each piece of luggage was placed at three-foot intervals. Thor was commanded to "seek" and after smelling the displayed luggage, he alerted on the large blue suitcase; that is he sat down next to it, indicating that he detected drugs inside. The blue suitcase had "Osin Eliasseint" written in large letters on the side. After the canine sniff, all the luggage was brought to the lobby, and the police waited to see who would pick up the blue suitcase. The entire canine sniff delayed the delivery of the luggage by approximately one minute.

Guirand's companion, [much later identified as Eliassaint], came up to the baggage check window and claimed the suitcase, at which point he and Guirand were detained on the basis of the positive alert by Thor on the blue suitcase. Although the blue suitcase had Eliassaint's name on it, he gave the police the alias of Andre LeBlanc so that the police did not know whether he or Guirand was the owner of the suitcase. Eliassaint did not appear to speak any English, but Guirand was able to and did converse with the police. She was read her Miranda rights and indicated that she understood them.

■ We think it is clear, as the police recognized, that probable cause to arrest did not exist until the trained dog reacted affirmatively to the blue luggage [1] that had been checked through to Wilmington. When the alert was given by the dog, we are satisfied that, at least when combined with the other known circumstances, probable cause existed to arrest. *See United States v. Robinson,* 707 F.2d 811, 815 (4th Cir.1983). Our conclusion is based on the demonstrated fact that trained dogs can detect the presence of concealed narcotics with almost unerring accuracy and the finding of the district court that this particular dog [2] met the training and reliability requirements.

Indeed, the Court of Appeals for the Second Circuit in *United States v. Waltzer,* 682 F.2d 370, 372–73 (1982), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983), concluded that a positive sniff alone constitutes probable cause to arrest the individual connected with the luggage. Furthermore, numerous authorities in other circuits, deciding such issue in the context of probable cause to search containers or luggage, reach the same result, e.g., *United States v. Klein,* 626 F.2d 22, 27 (7th Cir.1980).

Having determined that the police officer possessed probable cause to make an arrest at the railroad station based on a reasonable belief as to contemporaneous illegal narcotics activity, we must next determine whether he had probable cause to arrest the defendant.

We summarize what was known to the police about defendant at the time of the arrest. First, they were aware, through hearsay, of the activities of defendant and her companion before the officers came to the railroad station; that defendant and her companion used a common confirmation phone number in purchasing their tickets for cash in West Palm Beach; that, later, they were traveling together; that their common destination was Wilmington, Delaware; that while in the train station and awaiting their checked piece of baggage, they took turns "watching" their carry on luggage; and of importance, that the canine sniff was positive as to the luggage claimed by defendant's traveling companion.

When asked by the police at the railroad station for permission to search the blue bag after the positive alert by the dog, the

---

**1.** The sniff test did not amount to an illegal search of the blue bag because it was in the custody of a common carrier at the time. *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983).

**2.** We agree with the district court that the later discovery that the blue luggage did not contain a quantity of drugs does not negate the effect of the positive alert for probable cause purposes.

defendant gave her assent. It is true that her companion did not speak English but, so far as the record shows, she did not purport to be speaking on her companion's behalf. Furthermore, the police did not know whether the name on the luggage itself, Olin Eliasseint, was that of a male or female. The defendant's companion did not identify himself to the police by the name on the blue bag.[3] Indeed, he used an alias until much later.

We believe that at the time of the arrest the police were reasonably entitled to believe under the totality of the circumstances, *United States v. Belle*, 593 F.2d 487, 497 (3d Cir.), *cert. denied*, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277 (1979), that the blue bag was as likely to be the defendant's as her companion's, assuming an either/or approach was even required here. In such a situation we conclude that the police had probable cause to arrest defendant. Thus, we agree with the district court that defendant's arrest was valid. We therefore need not decide whether the police action in taking defendant to the police station could be justified as coming within *Terry* stop parameters.

We turn now to defendant's attack on the legality of the search of her luggage. When defendant was taken to the police station she was asked to consent to a search of all of her luggage, including the blue bag which had not been opened at the railroad station. At the same time, the police were preparing an affidavit to be used to obtain a warrant to search defendant's luggage. Before the application for a search warrant was completed the defendant signed a form consenting to the search.

■ Defendant argues that the consent, while she was under arrest, was not voluntary because she was a native of Haiti and had limited familiarity with English. Given the facts recited in the Memorandum Opinion of the district court—defendant's several years of residence in Delaware, possession of a Delaware driver's license and her "evolving" ability to understand English— we cannot say that the finding of the district court that the consent was freely given is clearly erroneous or legally incorrect.[4]

■ Defendant next contends that there was insufficient evidence to support the jury's verdict on Count IV (money laundering). Under 18 U.S.C. § 1956 one of the elements the government must prove is knowledge by the defendant that the financial transactions in which she was engaged were designed in whole or in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Defendant argues that there is insufficient evidence to show that defendant knowingly

3. The following testimony was given at the suppression hearing by a police officer who was present at the railroad station:
Q Now, Mr. Eliassaint's name was on the side of that suitcase; is that correct?
A That was the name on there. I don't know whether that is a male or a female name.
Q And you had no reason at that point to believe that Ms. Guirand was the owner of that suitcase?
A I had no reason to believe anything one way or the other at that point.
Q What was the name of the gentleman that you thought was traveling with Ms. Guirand?
A He identified himself to us and was arrested by us under the name of Andre LeBlanc. I understand since that time that that is not his true name.
Q So Mr. Eliassaint at the time he was stopped—was it by you or by someone else?
A I don't know who Mr. Eliassaint is.
Q Well, the gentleman that was with Ms. Guirand that was stopped.
A Yes.
Q You said he identified himself as Andre LeBlanc?
A Yes.
Q Did this gentleman identify himself— which officer was it that he identified himself to?
A There were several of us in the room. He had some type of government card on him with the name of Andre LeBlanc, and he indicated that that was his name. When we interviewed him through an interpreter at the police station, that was the name he continued to use.

4. Because of our finding that the defendant knowingly and voluntarily consented to the search, we need not reach the defendant's other contentions regarding the legality of the search which are based on the premise that her consent was not valid.

used the services of Haitelex Transfer & Data Exchange, for the purpose of concealing the nature, location, ownership and control of the cash she made by trafficking in crack. The use of Haitelex by defendant to transfer $22,000 in cash to Haiti over a five month period with the use of the services of her fellow countryman, Deslaurier, rather than a bank, when coupled with evidence of her engagement in narcotics' sales, were sufficient, without more, to permit the jury to reasonably infer that she possessed the required knowledge to justify her conviction on Count IV.[5]

Defendant next asserts that the district court abused its discretion in denying a new trial on Counts I (conspiracy) and IV (money laundering). This argument is based on some of the testimony of a government informant, Officer LaFalaise, that was later found to be perjured. He testified that he approached Serge Deslaurier, an alleged co-conspirator, in order to purchase crack. He said that Deslaurier informed him that he did not have any drugs but wrote out a note and gave it to him, instructing a third party to provide drugs to LaFalaise. He also testified that by use of the note he obtained cocaine.

■ After the trial and conviction of defendant, it was revealed that LaFalaise, a government witness, had perjured himself in certain respects at the trial, particularly as to the author of the note. In ruling on defendant's motion for a new trial on this count, the district court stated in its Memorandum Opinion of September 2, 1988, that the parties agreed that the so-called *Larrison* rule should be applied. *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928). Under that rule the following must be established:

1.  A material witness gave false testimony;

2.  Without the false testimony, the jury might have reached a different verdict; and

3.  The defendant did not know the testimony was false until after the trial.

It is recognized that *United States v. Meyers*, 484 F.2d 113, 116 (3d Cir.1973), did not flatly adopt the *Larrison* rule. *See Government of Virgin Islands v. Lima*, 774 F.2d 1245, 1251 n. 4 (3d Cir.1985) (stating *Larrison* test has not been adopted by Third Circuit, citing *Meyers*). We will, however, proceed to determine whether that test was properly applied here.

The parties agreed in the district court that the first and third prongs of the *Larrison* test had been met. Thus, the sole issue was whether, without the false testimony, the jury might have reached a different verdict. We review the district court's denial of a new trial for abuse of discretion.

■ The district court pointed out that LaFalaise was not connected in any way with the subject matter of the first count, the arrest of defendant at the railroad station for narcotics trafficking. He did not testify about it in any way. Clearly, then, there was no abuse of discretion in denying a new trial on the first count.

We turn to defendant's contention that a new trial should have been granted, in any event, on Count IV (money laundering) because of LaFalaise's perjury. Defendant argues that without the perjured testimony the single link to establish the money laundering charge was LaFalaise's testimony. The district court disagreed, finding that the government made its case without his testimony. LaFalaise testified that he approached Serge Deslaurier, an alleged co-conspirator, in order to purchase an ounce of crack cocaine. LaFalaise further testified that Deslaurier informed him that he did not have any drugs in his possession, but wrote out a note and gave it to LaFalaise, instructing a third party, Fenel Atibel, to provide said drugs to LaFalaise. LaFalaise also testified that through the use of the note, he obtained an ounce of cocaine from Atibel. After the trial it was

---

**5.** In view of this conclusion we need not address the admissibility of the two newspaper articles found in defendant's residence dealing with seizure of cash from Haitian narcotic dealers in the area where defendant resided. Their admission, even if error under the balancing test, Fed.R.Evid. 403, certainly did not rise to the level of reversible error.

established that LaFalaise lied about the origin of the note.

Given these circumstances, was the perjured testimony related to any material part of the allegations in Count IV?

An examination of the record reveals that LaFalaise's false testimony was not in any realistic sense related to the money laundering charge. The evidence of defendant's drug trafficking and involvement in the financial transactions, including the Haitelex transfers, all support the district court's conclusion:

> Because we find that without the false testimony, and, indeed, without any testimony from Office LaFalaise, the jury would have come to the same verdict on the money laundering charge, we will deny defendant's motion for a new trial on that count.

Defendant contends that we should not limit our analysis on this issue to the requirements set forth in *Larrison* referred to *United States v. Meyers,* 484 F.2d 113, 116 (3d Cir.1973). Rather, she argues that we should follow *United States v. Stofsky,* 527 F.2d 237, 246 (2d Cir.1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976), which suggests that:

> Upon discovery of previous trial perjury by a government witness, the court should decide whether the jury probably would have altered its verdict if it had had the opportunity to appraise the impact of the newly-discovered evidence not only upon the factual elements of the government's case but also upon the credibility of the government's witness.

Assuming that this court is free to apply *Stofsky* despite the concession of the parties at the hearing, we think defendant's argument fails because we believe, as did the district court, that the jury would have arrived at the same verdict without any of the testimony of LaFalaise. We say this primarily because the testimony was basically unrelated to this count. Rather, it related to a transaction with another party. Since the findings of the district court on this issue, with which we agree, were based on a prophesy that went beyond "probability", we think the same result obtains here even under *Stofsky.*

The district court did not abuse its discretion in denying defendant's motion for a new trial on Counts I and IV.

The judgment of sentence will be affirmed.