**UNITED STATES of America, Plaintiff,**

v.

**Freddy R. GERMOSEN–GARCIA, and Luciano Nunez, Defendants.**

**Crim. A. Nos. 89–10009–01, 89–10009–02.**

United States District Court,
D. Kansas.

May 9, 1989.

Kim Martin, Asst. U.S. Atty., Wichita, Kan., for U.S.

Cyd Gilman, Wichita, Kan., Asst. Federal Public Defender, for Germosen–Garcia.

Charles A. O'Hara, Wichita, Kan., for Nunez.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

The defendants, Freddy Germosen–Garcia and Luciano Nunez, have been charged with possession with intent to distribute 10.5 ounces of cocaine in violation of 21 U.S.C. § 841(a)(1), and aiding and abetting in violation of 18 U.S.C. § 2. Both defendants have moved to suppress evidence obtained during the course of Drug Enforcement Agency investigations on January 18, 1989. They contend that DEA agents did not possess a reasonable suspicion to subject their luggage to the attention of a dog trained to detect narcotics, and that the DEA agents improperly stopped them at Wichita Mid–Continent Airport. Defendant Nunez asserts the additional ground for suppression that he did not speak English with sufficient understanding to have knowingly consented to the search of his luggage.

On April 24, 1989, the court conducted an evidentiary hearing on the defendants' motions. At that time, the court concluded that the suppression motions were without merit, and announced its decision. Consistent with the statements of the court at that time, and for the reasons presented herein, the court finds that the defendants' motions must be overruled.

The evidence presented permits the court to reach the following findings of fact. On January 17, 1989, Nunez and Germosen–Garcia arrived at Wichita Mid–Continent Airport at approximately 11:03 P.M. The defendants had traveled to Wichita from New York, via Dallas–Fort Worth. Their arrival was noted by DEA agents Ken Atnip and Michael Upchurch, who were on the lookout for suspected drug couriers of Dominican descent traveling to Wichita from New York. Agent Upchurch testified that, based upon his experience, drug couriers have not infrequently been found to be persons of Dominican ancestry traveling from La Guardia Airport in New York. According to Upchurch, the defendants appeared to be Latin or Hispanic, and that this was one factor (in combination with others) which led him to consider whether Nunez and Germosen–Garcia might fit the characteristics of a drug courier profile. However, Upchurch also testified that at this time he had not concluded that the defendants were, in fact, drug couriers.

While in the terminal, the defendants walked in a brisk manner. Both defendants appeared to be nervous and unsure of themselves. The defendants approached Jerry Joyce, a uniformed airport security officer, to inquire about their luggage.

Germosen–Garcia told Joyce they had arrived ten minutes before their original flight from New York. While their bags had made the flight, the defendants themselves had not made the flight. Germosen–Garcia identified himself as "Freddy Perez," and described two items of luggage: a black duffel bag and a blue suitcase.

Joyce agreed to help the defendants, and was able to determine that the defendants' luggage had gone to Chicago and would not arrive in Wichita until the next day. The defendants, according to Joyce, appeared upset at this time. Joyce told them where their luggage was located, and accompanied them to the baggage claim area at the airport where he helped them fill out claim forms. The defendants refused an offer by baggage personnel to have the bags delivered the next day, stating they would return to pick them up. The defendants told Joyce they were in Wichita for a family visit, and that they would be staying at the Wichita East Motel.

When the defendants left, Joyce imparted this information to Upchurch and Atnip. Joyce told them it seemed unusual for the defendants' luggage to have made their flight, while the defendants missed it. The DEA agents arranged to have the defendants' taxi followed by Wichita police. This surveillance revealed that the defendants had gone to stay at the English Village Inn in Wichita.

The flight containing the defendants' luggage was scheduled to arrive the following day at 10:25 A.M. However, the flight ran late and did not arrive in Wichita until approximately 11:25 A.M. When the aircraft arrived, the agents arranged for Wenka, a police dog trained to detect narcotics, to sniff a sample of luggage taken from the Chicago flight. This sample included the defendants' luggage, and Wenka alerted to the duffel bag. The delay in conducting the drug sniffing does not appear to have taken more than a few moments.

The luggage then was delivered to the baggage claim area. Germosen–Garcia entered the claim area and presented the claim tickets for both the duffel bag and the blue suitcase. As the defendants were leaving the airport terminal, Upchurch approached them and identified himself as a DEA agent. Upchurch asked if he could speak with the defendants, and they agreed.

Upchurch asked the defendants for identification. Germosen–Garcia told Upchurch his name was "Freddy Perez," and this

name also appeared on his ticket receipt. However, the resident alien card produced as identification by the defendant had been issued to "Germosen–Garcia, Freddy Ramon."

Upchurch then asked the defendants for permission to search their luggage. Germosen–Garcia asked whether there was a problem. The DEA agent told them that a dog had alerted to their luggage. The defendants then consented to the search of the luggage.

The defendants and their luggage were then escorted to the security office at the airport. Upon reaching the security office, the defendants again consented to the search. According to the agents, Germosen–Garcia consented to a search of the duffel bag, while Nunez indicated his permission to search the blue suitcase. The agents searched the duffel bag, but were unable to locate any drugs. After the completion of the search, Upchurch again asked Nunez whether he agreed to their search of the suitcase. In response, Nunez produced the key to the suitcase.

Inside the suitcase, the agents discovered a plastic bag containing 10.5 ounces of cocaine. The defendants were then placed under arrest. During the course of a search incident to this arrest, the agents discovered a rolled up one dollar bill in Germosen–Garcia's pocket which contained a small amount of cocaine. Based upon this evidence, the court concludes that the motions to suppress must be denied for two independent reasons.

■ First, the court finds that the defendants knowingly and voluntarily consented to the search of their luggage. Even assuming the earlier use of the drug dog Wenka was improper, the actions of the defendants in voluntarily permitting the search of their luggage creates an independent basis for upholding the search of the duffel bag and suitcase.

Upon discovering cocaine in the blue suitcase, the DEA agents had probable cause to arrest both defendants, and therefore to conduct the search of Germosen–Garcia's person which revealed the dollar bill con-

taining cocaine. Nunez had consented to the search of the blue suitcase, indicating he had at least some partial interest in or control over the suitcase. Germosen–Garcia had presented the claim checks for both the duffel bag and the suitcase on January 18, and had picked up both bags. There was a discrepancy between the name under which Germosen–Garcia was traveling and the name on his resident alien identification card. Germosen–Garcia had traveled together with Nunez from New York to Dallas–Fort Worth to Wichita. He had also given false information about where he would be staying while in Wichita. Based upon the information the agents had available to them, the agents had probable cause to arrest Germosen–Garcia either for carrying narcotics, or for aiding and abetting in the smuggling of narcotics.

The facts in the present case require a finding that the defendants knowingly and voluntarily consented to the search of their luggage on January 18, 1989. However, the court also finds that the initial use of the drug dog Wenka to sniff the defendants' luggage was proper. The positive response by Wenka to one of the defendants' bags also created probable cause for the arrest of the defendants.[1]

The court does not make any finding whether or not the DEA agents, at the time of the drug sniffing, possessed a reasonable suspicion that the defendants were engaged in narcotics smugggling. Rather, the court bases its determination upon the lack of any interference with the defendants' immediate possessory interests in the luggage. Under the circumstances presented in this case, the court finds that the DEA agents were not required to possess a reasonable suspicion prior to use of the drug dog Wenka.

The starting place for any analysis of the Fourth Amendment principles relating to canine drug sniffing is the decision of the Supreme Court in *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In *Place,* the Court addressed the propriety of the sniffing of an airline passenger's luggage. Suspecting the defendant passenger of possible drug smuggling, DEA agents approached the defendant and requested permission to search the defendant's luggage. When the defendant refused, the agents seized the luggage. Some 90 minutes later, a drug detecting dog alerted to one of the two bags of the defendant.

In addressing the validity of the agents' use of the dog, the Court first found that the dog's sniffing did not constitute a search within the scope of the Fourth Amendment.

A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is sui generis. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search"

---

1. That the item of luggage to which Wenka alerted (the black duffel bag) did not contain narcotics "does not negate the effect of the positive alert for probable cause purposes." *United States v. Massac,* 867 F.2d 174, 176 n. 2 (3d Cir.1989).

within the meaning of the Fourth Amendment.

462 U.S. at 707, 103 S.Ct. at 2644.

However, while the drug sniffing of the dog was not itself a search for Fourth Amendment purposes, the Court found that a seizure of the luggage had occurred. And, because of the long delay involved in the detention of the luggage, the Court concluded that the seizure could not be justified on a standard less than probable cause. In reaching this conclusion, the Court defined the nature of the seizure at issue: "The precise type of detention we confront here is seizure of personal luggage from the immediate possession of the suspect for the purpose of arranging exposure to a narcotics detection dog." 462 U.S. at 708, 103 S.Ct. at 2645–46.

The Court then found that such a detention constituted a seizure under the Fourth Amendment. The action of the law enforcement officers in detaining luggage from the immediate possession of a suspect is an intrusion

on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained. Nevertheless, such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return.

*Id.* (footnote omitted).

The Court concluded that, under such circumstances, the same principles relating to a detention of the suspect's person would apply. However, since the defendant's luggage had been detained for approximately 90 minutes, the Court found that the detention could not be justified as a limited investigatory detention under the principles established in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Because the detention of the luggage was prolonged for this length of time, the seizure could be justified only by the existence of probable cause. 462 U.S. at 709–710, 103 S.Ct. at 2645–46.

In *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Court stated that the first clause of the Fourth Amendment was designed to prevent the infringement of two expectations. The first protection involves "searches," which the Court defined as an intrusion on "an expectation of privacy that society is prepared to consider reasonable." 466 U.S. at 113, 104 S.Ct. at 1656 (citations omitted).

The second protection involves "seizures" of persons or property. Citing *Place,* the Court defined such seizures of property as "some meaningful interference with an individual's possessory interests in that property." *Id.* The Court noted:

While the concept of a "seizure" of property is not much discussed in our cases, this definition follows from our oft-repeated definition of the "seizure" of a person within the meaning of the Fourth Amendment—meaningful interference, however brief, with an individual's freedom movement.

*Id.,* at n. 5.

■ Under these principles, the use of the drug dog Wenka constituted neither a search nor a seizure of the defendants' luggage under the Fourth Amendment. The drug sniffing activities are clearly not a search under the rule established in *Place.* The Fourth Amendment provides protection against the violation of a reasonable expectation of privacy. Here, the investigative device is designed to detect the presence of contraband narcotics only. The investigative device was used in a public area. Under these circumstances, no reasonable expectation of privacy was infringed.

■ Nor is there a seizure within the meaning of the Fourth Amendment. At the time of the drug sniffing, the defendants' luggage was still in the possession of a third party common carrier. The luggage was not seized from the immediate

possession of the defendants, as in *Place*. The evidence indicates no significant delay in processing the luggage. Under these circumstances, no significant possessory interest in the luggage was violated. Nor did the drug sniffing test intrude on a potential liberty interest of the defendants by creating a possible disruption in their travel plans. *See Place*, 462 U.S. at 709, 103 S.Ct. at 2645.

Certainly, the government possesses a very strong interest in the detection and apprehension of the smugglers of narcotics. The Supreme Court has recognized that the drug problem represents "one of the greatest problems affecting the health and welfare of our population." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. ——, ——, 109 S.Ct. 1384, 1392, 103 L.Ed.2d 685, 704 (1989). In *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985), the Court concluded that the smuggling of drugs had created a "veritable national crisis in law enforcement."

Justice Powell discussed the nature of this crisis in his opinion in *United States v. Mendenhall*, 446 U.S. 544, 561–562, 100 S.Ct. 1870, 1880–81, 64 L.Ed.2d 497 (1980) (Powell, J. concurring), stating:

> The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement.

*See also Place*, 462 U.S. at 704 n. 5, 103 S.Ct. at 2643 n. 5 (also quoting Justice Powell in *Mendenhall*).

■ This court concludes that the use of drug detection dogs is an appropriate response to this public crisis. It also concludes that when the dogs' skills are ap-

plied to property outside the possession of the suspect, no Fourth Amendment principles are infringed. Under such circumstances, reasonable suspicion is not a prerequisite for the use of a drug detecting dog.

The Tenth Circuit has not addressed the present issue. In two cases, the court has expressly refused to consider the issue of the necessity of reasonable suspicion for the use of narcotics detecting dogs. *United States v. Stone*, 866 F.2d 359, 363 n. 2 (10th Cir.1989); *United States v. Williams*, 726 F.2d 661, 663 (10th Cir.), *cert. denied*, 467 U.S. 1245, 104 S.Ct. 3523, 82 L.Ed.2d 830 (1984). Instead, the court simply found that a reasonable suspicion existed under the facts of both cases.

One case has expressly found that the canine sniffing of packages outside of a suspect's possession requires reasonable suspicion. In *United States v. Hill*, 701 F.Supp. 1522 (D.Kan.1988), Judge O'Connor held that postal inspectors were required to possess reasonable suspicion in order to conduct drug dog sniff tests of express mail packages in their possession. He stated:

> Finally, although a canine sniff is neither a search nor a seizure, *United States v. McCranie*, 703 F.2d 1213, 1218 (10th Cir.), *cert. denied*, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983), a majority of courts have either found the existence of a reasonable suspicion or required a reasonable suspicion that a package or piece of luggage contained contraband when upholding a canine sniff of the package/luggage for narcotics.

701 F.Supp. at 1527–1528 (footnote 4 omitted). Accordingly, the court concluded that the reasonable suspicion requirements of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), applies to the detention of express mail packages held by the post office. 701 F.Supp. at 1528.

However, the authorities cited by the *Hill* court in its footnote number 4 do not support its conclusion that "a reasonable suspicion is a necessary prerequisite for subjecting a package to a canine sniff." *Id.* Of the nine cases cited by the court in

footnote 4 as support for its position, none provide an adequate basis for requiring reasonable suspicion for the use of canine drug detection of packages or luggage outside the possession of their owner. All of the cited cases are either inapplicable to the issue of the necessity of reasonable suspicion under these circumstances, or have been modified by later decision.

Most of the cited decisions simply find that reasonable suspicion existed under the facts of the case, and do not reach the issue of whether the drug sniff test would have been permissible in the absence of reasonable suspicion. *See United States v. Alpert,* 816 F.2d 958, 961 (4th Cir.1987); *United States v. Quinn,* 815 F.2d 153, 159 (1st Cir.1987); *United States v. Erwin,* 803 F.2d 1505, 1509 (9th Cir.1986); *United States v. West,* 731 F.2d 90 (1st Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 956, 83 L.Ed.2d 963 (1985); *United States v. Williams,* 726 F.2d 661, 663 (10th Cir.), *cert. denied,* 467 U.S. 1245, 104 S.Ct. 3523, 82 L.Ed.2d 830 (1984); *United States v. Klein,* 626 F.2d 22, 26–27 (7th Cir.1980); *United States v. Freymuller,* 571 F.Supp. 61, 63 (N.D.Ill.1983).

Moreover, in each of the above cases (with two exceptions), the luggage subjected to the drug sniffing had been detained from the person or possession of the defendant. *See Alpert,* 816 F.2d at 959; *Quinn,* 815 F.2d at 154–155; *Erwin,* 803 F.2d at 1507; *West,* 731 F.2d at 91; *Klein,* 626 F.2d at 24. Accordingly, these cases provide no authority for determining whether reasonable suspicion is necessary for canine drug sniffing of packages outside the possession of the defendant. In *Williams* and *Freymuller,* the luggage was in the possession of an airline carrier when it was detained for drug sniffing. In both cases, however, the court simply decided that reasonable suspicion was present. Neither case indicates, even in dicta, that the drug sniffing required reasonable suspicion as a prerequisite. Indeed, as noted earlier, the Tenth Circuit expressly avoided such a determination in *Williams.* 726 F.2d at 663.

Of the two remaining cases cited in *Hill,* neither provides convincing authority for requiring reasonable suspicion for a canine drug sniff under the circumstances present here. In *United States v. Whitehead,* 849 F.2d 849, 857 (4th Cir.1988), the Fourth Circuit, stating that "*Place* obviously did not sanction the indiscriminate, blanket use of trained dogs in all contexts," found that reasonable suspicion was required in order to subject the defendant's luggage to drug sniffing. In *Whitehead,* the police had entered the defendant's train compartment (while he was present), and conducted a canine sniff test of the luggage in the compartment. The court found that the defendant did not have a full expectation of privacy in the train compartment similar to that held for a person's residence, and that the police were therefore not required to possess probable cause in order to conduct the drug sniffing. 849 F.2d at 855. However, the court found that the defendant still had a definite (though reduced) expectation of privacy in the train compartment which required the existence of reasonable suspicion in order to conduct the drug sniffing. 849 F.2d at 857–858.

*Whitehead* is obviously unhelpful in resolving the present issue. Other courts have also indicated that reasonable suspicion or probable cause may be necessary for the use of canine drug sniffing in an area where the defendant possessed an expectation of privacy. *See, e.g., United States v. DiCesare,* 765 F.2d 890, 989–899 (9th Cir.1985) (use of drug dog to sniff suitcase found after entering private apartment); *United States v. Thomas,* 757 F.2d 1359, 1367 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985) (use of drug dog to sniff at door of defendant's apartment). Like *Whitehead,* these cases are based on the determination that the defendant possessed a privacy interest in the area where the drug sniffing occurred. In the present case, however, defendants Nunez and Germosen–Garcia had no privacy interest in the airline baggage area where the dog Wenka conducted its examination of the luggage from the Chicago flight.

Finally, the ninth case cited in *Hill* also fails to support the conclusion of the court. The court cites *United States v. Beale,* 731

F.2d 590 (9th Cir.1983) (*Beale II*), in which a panel of the Ninth Circuit Court of Appeals held that a reasonable suspicion was required in order to conduct a canine drug sniff test of luggage located in an airline baggage area.

In *Beale*, the district court had upheld the use of the sniff test, without determining whether reasonable suspicion existed, finding that the sniffing did not constitute a Fourth Amendment intrusion. The Ninth Circuit vacated this holding in *United States v. Beale*, 674 F.2d 1327, 1335 (9th Cir.1982) (*Beale I*), finding that "the use of a canine's keen sense of smell" to detect to odor of drugs in the defendant's luggage was a Fourth Amendment intrusion requiring the existence of a reasonable suspicion.

Seven days after its decision in *Place*, the Supreme Court vacated *Beale I*, and remanded the case for further consideration in light of that decision. *United States v. Beale*, 463 U.S. 1202, 103 S.Ct. 3529, 77 L.Ed.2d 1382 (1983). In the *Beale II* decision cited by the court in *Hill*, the Ninth Circuit panel again vacated the district court's judgment, finding that the canine sniffing must be based upon a finding of reasonable suspicion. 731 F.2d at 596. The *Beale II* court first found that the Supreme Court's determination in *Place* that a canine drug sniff was not a "search" for Fourth Amendment purposes was dicta. 731 F.2d at 593. However, because the dicta was "so recent and appear[ed] to have been so carefully considered," the court proceeded to apply it to the circumstances present before it. *Id.* In doing so, it adopted a narrow construction of *Place*, finding that the Supreme Court merely meant that a canine drug sniff test was not a "search" only in that full probable cause was not required for the test.

In concluding that a canine sniff was not a "search," the Court indicated that the Fourth Amendment imposed no more stringent requirement for performance of a canine sniff beyond the reasonable suspicion required to justify the initial detention of the luggage. We do not believe that *Place* should be read to validate a canine sniff in the absence of the reasonable suspicion required for a minimally intrusive detention of luggage, whenever fortuity makes a canine sniff feasible without any seizure of the luggage.

731 F.2d at 593–594.

Taken alone, the decision in *Beale II* would support the conclusion reached in *Hill*. However, the *Hill* footnote fails to mention the subsequent rehearing of the matter in *United States v. Beale*, 736 F.2d 1289 (9th Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) (*Beale III*). Considering the case *en banc*, the Ninth Circuit reversed the decision in *Beale II*, and affirmed the defendant's judgment of conviction by the district court.

In reaching this conclusion, the court first concluded that *Place* constituted a binding precedent for other courts. In its decision in *United States v. Jacobsen*, 466 U.S. 109, 123, 104 S.Ct. 1652, 1661, 80 L.Ed.2d 85 (1984), the Supreme Court interpreted its earlier conclusion in *Place* as a holding, stating that in *Place* "the Court held that subjecting luggage to a 'sniff' test by a trained narcotics detection dog was not a 'search' within the meaning of the Fourth Amendment." Citing this statement in *Jacobsen*, the Ninth Circuit concluded that "[w]hether or not the statement in *Place* was a holding or dictum, the Supreme Court has clearly directed the lower courts to follow its pronouncement." 736 F.2d at 1291.

The court then found that the use of the canine sniff test had not violated the defendant's Fourth Amendment rights.

In *Place*, as well as in *Jacobsen*, the investigative technique did not require any contact with the owner of the property being investigated, as the property investigated was located in a baggage area. Here, we are not confronted with a case in which the detection dog conducted a sniff of a person rather that an inanimate object, or a sniff of luggage that a person was carrying at the time. The investigative technique applied to Beale's luggage caused "virtually no annoyance and rarely even contact with the

owner of the bags, unless the [test result] is positive." *United States v. Waltzer*, 682 F.2d 370, 373 (2d Cir.1982), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983). There is no evidence that Beale himself was detained, even for a moment, due to that sniff. 736 F.2d at 1291–1292 (footnotes omitted). The court noted that the defendant had not been delayed or inconvenienced by the drug sniffing, and that the use of the drug dogs caused no interference in the defendant's travel plans. The court concluded that "[a]ny interference with [the defendant]'s possession of his luggage was de minimis," and that there was "thus no seizure of his property necessitating probable cause or reasonable suspicion." 736 F.2d at 1392 (citing *Jacobsen*, 466 U.S. at 113, 125 n. 28, 104 S.Ct. at 1656, 1662–63 n. 28).

The court then affirmed the decision of the district court, which had upheld the use of the drug sniffing without a determination of reasonable suspicion. *Beale* thus contradicts, rather than supports, the conclusion reached in *Hill*. Of the nine cases cited in the footnote in *Hill*, none provides convincing support for the conclusion that a canine sniff test of a package or luggage outside the possession of a suspect raises Fourth Amendment concerns.

The *Hill* court also noted one other authority for its conclusion: *United States v. Van Leeuwen*, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970). In *Van Leeuwen*, postal officials detained two packages mailed by the defendant while customs officers obtained a warrant to open and inspect the packages. When the packages were opened, the customs officers found they contained gold coins. The defendant was subsequently convicted of illegally importing gold coins. The Supreme Court simply found that the officers possessed a reasonable suspicion to detain the packages, and that the resulting delay in delivering the packages did not render the detention unreasonable under the circumstances present in the case. The issue of the use of drug detecting dogs was not present in the case, since the packages had been detained for physical opening and inspection pursuant to a warrant. Thus the Court's opinion provides no support for the conclusion that, for property outside the possession of the defendant, a reasonable suspicion is necessary for the use of canine drug sniffing, which, by its nature, does "not intrude upon any legitimate privacy interest [since it] could reveal nothing about noncontraband items." *Jacobsen*, 466 U.S. at 124 n. 24, 104 S.Ct. at 1662 n. 24.

But while there is little authority for the requirement of reasonable suspicion in these circumstances, there is clearly support for the opposite viewpoint. In addition to *Beale III*, discussed above, the Fifth Circuit's decision in *United States v. Lovell*, 849 F.2d 910 (5th Cir.1988), is also helpful. In *Lovell*, border patrol agents observed nervous activity by the defendant as he waited for his airline flight. They went the the airline's baggage area, where they removed the defendant's suitcases from the conveyor belt. Detecting a faint odor of marijuana, they arranged for a drug dog to sniff the luggage. The dog alerted to the luggage, and a search warranted was issued for an inspection of the luggage.

The Fifth Circuit concluded that the agents' removal of the luggage from the baggage conveyor belt did not constitute a seizure requiring reasonable suspicion. The court noted that *Place* had established that a drug sniff test was not a search under the Fourth Amendment, but had found "that there was undoubtedly a seizure of the defendant's luggage when it was taken *from his custody* in order to arrange exposure to a narcotics detection dog." 849 F.2d at 915–916 (citing *Place*, 462 U.S. at 707–709, 103 S.Ct. at 2644–2646) (emphasis in *Lovell*).

The court then found that the basis for finding a seizure in *Place* did not exist under the facts in *Lovell*.

The facts in *Place* are clearly distinguishable from those before us. Lovell had surrendered his bags to a third-party common carrier with th expectation that the carrier would transport the bags to Lovell's destination for him to reclaim when he arrived. There is no suggestion

that if the agents had not smelled marijuana, Lovell's travel would have been interfered with or his expectations with respect to his luggage frustrated. The agents' brief removal and compression of Lovell's bags cannot be analogized to a seizure of Lovell himself. The momentary delay occasioned by the bags' removal from the conveyor belt was insufficient to constitute a meaningful interference with Lovell's possessory interest in his bags. As a result, the agents' actions did not constitute a seizure.

849 F.2d at 916 (footnotes and citations omitted).

In *United States v. Massac*, 867 F.2d 174 (3d Cir.1989), the court reached a similar result in its conclusion that the positive alert of a drug dog, in combination with other known factors, created probable cause for the arrest of the defendant. The court did not conclude that the original drug sniffing was justified upon the presence of reasonable suspicion. Rather, citing *Place*, the court simply noted that "[t]he sniff test did not amount to an illegal search of the blue bag because it was in the custody of a common carrier at the time." 867 F.2d at 176 n. 1.

The serious problem presented to the nation by the smuggling of illegal narcotics has been discussed above. This court is convinced that the use of drug detecting dogs has a vital role to play in attacking that problem. It is also convinced that the drug sniffing test used here did not infringe the defendants' Fourth Amendment rights.

For safety purposes, airline travelers in today's society are routinely subjected to a close scrutiny to detect the presence of weapons. This scrutiny often includes the use of metal detectors and x-ray screening of the travelers' luggage. The use of drug detecting dogs to sniff the luggage of passengers is a similar, necessary, and valid law enforcement device.

Law enforcement officers need not possess a reasonable suspicion to subject a traveler's luggage to canine scrutiny when the luggage: (1) is not taken from the immediate possession of the traveler or from an area in which he has a legitimate privacy interest; and (2) the delay involved is brief and does not interfere with the traveler's plans. Under these circumstances, no Fourth Amendment interests have been infringed. Under *Place*, no search has occurred and no legitimate privacy interests of the traveler have been violated. 462 U.S. at 707, 103 S.Ct. at 2644-2655. Neither has a seizure of the luggage occurred. The brief delay involved in conducting the drug sniffing involves at most "a de minimis impact on any protected property interest." *Jacobsen*, 466 U.S. at 125, 104 S.Ct. at 1662-1663.

IT IS ACCORDINGLY ORDERED.