**UNITED STATES of America, Appellee,**

v.

**Claude K. WEST, Defendant, Appellant.**

**No. 80–1727.**

United States Court of Appeals,
First Circuit.

Argued Oct. 4, 1983.

Decided April 6, 1984.

Douglas K. Mansfield, Boston, Mass., with whom Thomas D. Edwards, and Casner, Edwards & Roseman, Boston, Mass., were on brief, for defendant, appellant.

William F. Weld, U.S. Atty., Boston, Mass., with whom John C. Doherty, Asst. U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, GIBSON,[*] Senior Circuit Judge, and BOWNES, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

This case presents the narrow issue of the reasonableness of a detention and "sniff test" of luggage by Drug Enforcement Administration (DEA) officers in light of *United States v. Place*, — U.S. —, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The case was remanded to us by the Supreme Court, — U.S. —, 103 S.Ct. 3528, 77 L.Ed.2d 1382 (1983), and we in turn remanded to the district court for supplementation of the record, 723 F.2d 1 (1st Cir. 1983). The district court held an evidentiary hearing and certified findings to us which we append to this opinion.

We begin our analysis with the factual description from our first opinion:

> Claude West was convicted of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). His contention on appeal is that the district court erred in denying his motion to suppress the cocaine seized from his suitcase by Drug Enforcement Administration (DEA) agents at Logan Airport in Boston.

\* Of the Eighth Circuit, sitting by designation.

> There was testimony at the suppression hearing from which the court could find the following facts: West arrived at the airport in Miami on the morning of January 15, 1980, checked in for a flight to Boston, and made a reservation for a connecting flight to Burlington, Vermont. Two Dade County Public Safety Department officers, their suspicion aroused by West's appearance and conduct, approached him after he had passed through the metal detector and started walking down the concourse. He responded to their questions in a cooperative manner, showing them identification and permitting a search of his boots, but refusing to permit a search of his suitcase. West terminated the conversation himself, telling the officers to "keep up the good work" and leaving to board his flight. The officers alerted DEA agents in Boston, who awaited West's arrival there, observed his conduct, and approached him while he waited for his flight to Burlington. Twice in the course of his conversation with the agents, West told them (falsely, as the agents knew) that his suitcase had been searched in Miami. Asked about this a third time, he recanted and said that it had not. The agents requested his consent to search the suitcase, and West refused. The agents then told West that they were going to summon a narcotics detector dog to sniff the suitcase and that he could either wait with the suitcase (thereby missing his flight) or go on to Burlington. He chose the latter. The dog arrived and alerted to the suitcase, indicating the presence of drugs. The agents then obtained a warrant, searched the suitcase, and found 20 ounces of cocaine.

651 F.2d 71, 72 (1st Cir.1981) (footnotes omitted).

The Supreme Court in *Place* applied *Terry*-stop standards to detention of luggage for the purpose of conducting a "sniff test." 103 S.Ct. at 2644. In particular the Court stated that,

the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion. Moreover, in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation. We note that here the New York agents knew the time of Place's scheduled arrival at LaGuardia, had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on respondent's Fourth Amendment interests.

103 S.Ct. at 2645 (footnote omitted). Also relevant to the reasonableness of a detention of luggage is the duty of agents

> to accurately inform [a suspect] of the place to which they [are] transporting his luggage, of the length of time he might be dispossessed, and of what arrangement [will] be made for return of the luggage if the investigation dispel[s] the suspicion.

103 S.Ct. at 2646.

The agents in *Place* did not have any drug detection dog available at LaGuardia Airport, where Place's luggage was detained. They therefore transported the luggage to Kennedy Airport, where a dog was available. As a consequence, it was not sniffed until 90 minutes after it had been seized at LaGuardia. The officers made no arrangements with Place regarding return of his luggage other than giving him their telephone number and they misinformed Place that they were taking his bag to a judge to obtain a warrant.

■ The reasonableness of a detention of luggage for the purpose of conducting a "sniff test" is dependent on the facts of each case. We review the facts of the present case in light of the three main factors discussed in *Place:*

1) the diligence of officers in pursuing their investigation so as to minimize the intrusion;

2) the brevity of the detention; and

3) the information afforded the suspect regarding the detention and return of the luggage.

West argues that the officers were not diligent because they did not have a dog waiting at the gate when he arrived. While, as the district court found, the agents could have avoided alerting the suspect to the fact that he was under surveillance by concealing the dog and its handler in a non-public area near the gate (Finding # 2), we do not believe the agents acted unreasonably in not bringing a dog to the immediate vicinity before West's plane arrived. Given the frequent delays in air traffic, an absolute requirement that DEA agents have a dog waiting near the gate whenever a sniff test of a known suspect's baggage is either probable or possible would seem excessively burdensome. If dogs are to be used at all, the government must have some flexibility, bearing in mind there are practical limits to the number of dogs and handlers the government can maintain at one airport. In the present case West's flight was over 50 minutes late, and thus the dog and handler would have been forced to wait uselessly for over an hour near the gate before detention of West's luggage for sniffing.

■■ In *Place* the problem was not that a dog was not at the gate, but that no dog was available at the whole of LaGuardia Airport, thus necessitating a 90-minute trip to another airport before conducting the sniff test. Clearly the government must have its dog either at the same airport or at a similarly accessible location, so that the dog can sniff the suspect's luggage with dispatch. We do not read *Place*, however, as denying to officers some period of time for bringing a dog from one part of the same airport to another. We construe *Place* as mandating only that the dog be available within a reasonable time—which, absent extraordinary circumstances, means something far less than the 90-minutes in *Place*. In the present case the agents had a dog at the same airport where *West* arrived, and the dog could be obtained in no more than 20 minutes (Finding # 3). We

think this degree of preparedness was reasonable, and fell within permissible limits in a case like this.[1]

The next question is whether the agents' failure to summon the dog immediately upon arrival of West's flight constituted a lack of diligence. West's flight arrived at 12:35 and his flight to Burlington was scheduled to depart at 12:52. The district court found, under optimistic assumptions, that a dog summoned promptly at 12:35 *might* have been able to arrive on the scene and complete a sniff test by 12:55 (Finding # 5). Thus, given the late departure of the Burlington flight, the sniff test could conceivably have been completed in time for West's luggage to make the flight. However, we cannot fault the officers' conduct merely because in retrospect we can envision a course of events which would have lessened the degree of intrusion on West's fourth amendment interests. The district court found that the agents had not decided to request a search until they had observed and spoken to West (Finding # 8(b)). The agents further testified that most people consent to a search when asked, thus obviating the need to summon a dog (Finding # 2). (The DEA agents knew, however, that West had previously refused a request by the Dade County officers to search his luggage in Miami before boarding his flight to Boston. They had less reason, therefore, to believe that West would consent to a search.)

■ Nonetheless we do not believe that the failure to summon a dog immediately upon West's arrival was improper. This conclusion is supported by the recognition in *Place* of the "important need to allow authorities to graduate their responses to the demands of any particular situation." 103 S.Ct. at 2646 n. 10. Here the officers watched West for ten minutes for the purpose of ascertaining whether he was meeting with confederates (Finding # 1). The officers also wished to see whether his

behavior at the Boston airport would enhance or diminish the suspicion aroused in Florida that he possessed drugs (Finding # 1). The fact that West, when finally questioned, twice told the Boston officers falsely that his bag had been searched in Miami greatly strengthened the objective basis for their suspicions. This deception by West, coupled with the officers' observation of West's behavior and appearance and with the information they had received from Miami, led the officers to request a search. When West refused, they detained his luggage for a sniff test. As a result of this graduated approach, recognized as legitimate in *Place*, West's luggage was not seized until minutes before his flight was scheduled to depart. He declined to wait for the sniff test and instead travelled on to Burlington without his bag. The agents waited for West's flight to depart, walked to their office, and summoned the dog. The dog arrived 20 to 35 minutes later and the test was conducted (Finding # 6). Having reviewed the conduct of the agents during the entire course of events leading up to the sniff test, we hold that they behaved with the requisite diligence.

■ It is true that a total of between 45 and 60 minutes elapsed between the seizure and the sniff test. But much of this period occurred after West had departed without his luggage, when it had ceased to matter to him how soon the test was performed. We do not think, therefore, that the full 45–60 minutes should be counted against the government. *See Michigan v. Summers*, 452 U.S. 692, 701, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981) ("the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention"). Once West had left, the agents had no urgent reason to act immediately, since their further delay would not inconvenience

1. *See* ALI, *Model Code of Pre-Arraignment Procedure* § 110.2(1) (1975) (recommending 20-minute limit on *Terry* stops). We should not, however, be understood as establishing some talismanic time period. The Supreme Court expressly refused to do so in *Place*, 103 S.Ct. at 2646 n. 10, and we can imagine cases where longer or shorter periods would be in order.

West. It is true the Supreme Court drew no such distinction in *Place*. But in *Place* the police lacked the *ability* to have conducted a sniff test without the full 90-minute delay and without the added inconvenience of transporting Place's bag to another airport. Here, the sniff test could have been conducted within 20 minutes had West decided to remain with his bag.

The events which transpired after West's departure are significant mainly as some indication of the agents' preparedness.[2] The dog's arrival within 20 to 35 minutes after being summoned, even under circumstances of diminished urgency, tends, if anything, to confirm that the officers could have arranged for a sniff test to be conducted within 20 minutes of the bag's seizure had West elected to remain with his bag.

It may be argued that the lesser weight we accord the post-departure period might encourage officers in other cases to delay in approaching suspects in the hope that the suspects will choose to depart without their luggage. Every case, however, must be individually examined. The officers here acted diligently and in good faith. Had they not done so, a different result would be in order. Taking into account the agents' diligence and preparedness, we conclude that the detention in the present case was reasonable.

Finally we must examine the information given to West regarding the handling of his bag. The district court found that the agents furnished West with a written receipt describing the bag and giving one agent's name and the DEA office phone number. West was told orally that the bag would be taken to the DEA office for a sniff test and that West should call the DEA office at a later time to arrange for the bag's return. The district court found that this information was reasonable and appropriate (Finding #7). We agree. West was in a hurry to board his flight, so giving more detailed information would

have caused greater, not less, inconvenience. While ideally more definite arrangements for the bag's return might have been made (e.g., sending it on the next available flight), under the circumstances the information given was enough.

We therefore conclude that the seizure and detention in the present case were reasonable under the standards set out in *United States v. Place*. We accordingly uphold the district court's denial of West's motion to suppress.

*Affirmed.*

## APPENDIX

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIM. NO. 80–51–G |
| | ) | |
| CLAUDE K. WEST | ) | |

### FACTUAL FINDINGS ON REMAND

February 7, 1984

GARRITY, District Judge.

On December 12, 1983 the Court of Appeals remanded this case to us with instructions to hold a hearing, take evidence, make findings, and provide a certified record with respect to eight questions concerning the detention of defendant's suitcase at Logan Airport by Drug Enforcement Administration (DEA) agents for purposes of conducting a sniff test by a detection dog. We held hearings on January 27, 30 and February 3, 1984. The government submitted affidavits from DEA agents Herbert J. Lemon, Jr. and Robert Sampson, who seized defendant's suitcase, and U.S. Customs Officer Richard Lefebvre, who is assigned to handle detection dogs in the Boston area. The customs agent who actually handled the dog that conducted the sniff test on defendant's suitcase, Paul Thomas, currently works in Maine and was unavailable to attend the hearings. The three government affiants testified at the

---

**2.** The events which transpire after a suspect has departed will also be important if they increase the actual intrusion. Here, the time after West departed did not increase the actual intrusion (Finding # 6, n. 1).

evidentiary hearings and were cross-examined by defense counsel. The defendant submitted an affidavit of Lucien G. Rousseau, station manager for Delta Airlines at Logan Airport. Mr. Rousseau did not testify at the hearings. The defendant called one witness at the hearing, Stanley W. Wheatley, a third year law student at Boston University, who testified about the physical layout of the Delta terminal at Logan. The following eight findings of fact, in response to the specific questions framed by the Court of Appeals, are based both on testimony elicited during the evidentiary hearings and the submitted affidavits, which will be certified as part of the supplemental record.

(1) The reasons the agents did not approach West until minutes before the scheduled departure of his 12:52 p.m. flight to Burlington, including proper law enforcement objectives, if any, served by their delay.

*Finding:* West arrived at Logan from Miami at 12:35 p.m. Before approaching him, the agents conducted covert surveillance of West for approximately ten minutes in order to determine (a) whether he was travelling with or meeting confederates; and (b) whether his behavior gave rise to reasonable suspicion necessary to seize his suitcase for purposes of conducting a sniff test.

(2) The reasons the agents did not have the detection dog on hand, or in the immediate vicinity, when West arrived from Florida, and any proper law enforcement purposes that those reasons served.

*Finding:* In the experience of Agents Sampson and Lemon (approximately 100 contacts with individuals at Logan) most people consent to a search, so there is no need to call the dog away from its regular stations, which include the International Arrivals Terminal at Logan, the Seaport, the South Postal Annex and certain trucking facilities. The agents thought West's consent was particularly likely since he had been alerted to law enforcement suspicion in Miami and could have disposed of any narcotics while en route to and before reaching

Logan. In addition, the agents believed that stationing the dog, and its uniformed handler, in the immediate vicinity of the passenger terminal was undesirable because (a) it would have alerted West and his possible confederates; (b) a public area is distracting to the dog and would have made the sniff test less reliable; and (c) Delta would have objected to the possible disruption in passenger flow. Numerous non-public areas were available in the vicinity of the Delta passenger terminal, however, including stairwells, employee lounges, and an administrative area. The agents did not inquire about using any of these areas for the sniff test. Furthermore, the DEA office was approximately 150 yards from the Delta Terminal.

(3) The time within which diligent officers stationed at a major airport like Logan can reasonably be expected to secure the presence of a detection dog after they first determine they need one.

*Finding:* The logistics of every airport are unique and we received no evidence about major airports other than Logan. The time it takes to secure a detection dog at Logan is as follows:

(a) twenty minutes if the dog is on duty at the airport;

(b) forty-five minutes if the dog is on duty in Boston;

(c) sixty minutes otherwise.

(4) The time which a properly conducted sniff examination will take from the moment the dog arrives until its completion.

*Finding:* A "building search" takes two or three minutes. A properly conducted sniff examination takes one or two minutes.

(5) Whether there was sufficient time for the agents to have conducted a canine search so as to permit West's luggage to make the Burlington flight if they had summoned a dog directly upon the arrival of West's flight from Miami.

*Finding:* There was an interval of seventeen minutes between the arrival of West's flight (12:35 p.m.) and the sched-

uled departure of the flight to Burlington (12:52). In fact, the Burlington flight did not leave the gate until approximately 10 minutes after its scheduled departure time. If the dog had been summoned at precisely 12:35, had arrived in 15 minutes (rather than the 30 minutes it actually took), and had conducted the sniff test in a controlled area within two or three minutes, it is possible that the entire operation could have been completed by 12:55, thus permitting West's luggage to make the flight. This would have required smooth connections all around and a delayed departure; it would have been "tight" in any event.

(6) Whether the agents' delay *after* West had boarded the Burlington flight in arranging for the dog to sniff his luggage was justified and, in any event, whether the delay materially affected West.

*Finding:* The agents seized West's bag at approximately 12:50 p.m. They remained at the Delta Terminal with his bag until approximately 1:00 p.m., when the Burlington flight left the gate and they were sure that West was on the plane. The agents then walked immediately to the DEA office, arriving at approximately 1:10 p.m. Agent Lemon immediately called for the detection dog, which arrived between 1:30 and 1:45 p.m. Thus, allowing five minutes for the preparation and conduct of the sniff test, West's bag was detained between 45 and 60 minutes before probable cause was obtained. The test was completed before West's flight landed in Burlington.[1]

(7) The information provided in the receipt given to West and the arrangements made for return of his luggage, and whether such information was reasonable and appropriate.

*Finding:* West was given the option of remaining with his luggage or leaving the bag and catching his flight. He chose the latter. The receipt given to West was written on the back of his boarding pass and read "Received one airline ticket and one brown leather bag/(signed) Robert Sampson/617-2170." West was told to call the number, which is a 24-hour line at the Boston DEA offices, at a later time to make arrangements for the return of the luggage. Agent Sampson issued the receipt in a hurry because West's Burlington flight was boarding and West expressed concern about missing it. Sampson told West that they would take his bag to the DEA office to conduct the sniff test. Under the circumstances, such information was reasonable and appropriate.

(8) Any other factual findings and conclusions the district court deems material to determining whether the detention in question was constitutional under the standard announced in *Place.*

*Finding:*

(a) A "building search", as defined in footnote 3 of Chief Judge Campbell's opinion, is the most reliable method for conducting a canine sniff examination because the dogs are trained to do building searches. Nevertheless, the dogs will often respond reliably to the odor of narcotics even if they are exposed to a single piece of luggage.

(b) The agents had not decided before observing West and talking with him to request that he consent to a search of his suitcase.

(c) In January 1980 the Customs Service had two trained detector dogs in the Boston area. There is now only one here.

/s/ W. Arthur Garrity, J.
United States District Judge

---

**1.** Although the delay after West's departure did not *increase* the intrusion to West, this circumstance seems to be irrelevant under *United States v. Place,* 1983 [— U.S. —, 103 S.Ct. 2637, 77 L.Ed.2d 110] 51 U.S.L.W. 4844, where the Supreme Court measured the intrusion from the time of the seizure to the time when probable cause was obtained, notwithstanding the absence of the defendant.