UNITED STATES of America, Plaintiff,

v.

$191,910 IN U.S. CURRENCY, Defendant,

Bruce R. Morgan, Claimant.

No. C90–1276 TEH.

United States District Court, N.D. California.

Aug. 5, 1991.

Stephen L. Schirle, Michael D. Howard, William T. McGivern, Jr., U.S. Attorney's Office, San Francisco, Cal., for plaintiff.

David M. Michael, Mill Valley, Cal., for claimant Bruce R. Morgan.

## ORDER

THELTON E. HENDERSON, Chief Judge.

This matter came before the Court on July 29, 1991, on claimant Bruce R. Morgan's motion to suppress, and the government's counter-motion to dismiss. Having carefully considered the parties' written and oral arguments, and the entire record in this matter, the government's motion to dismiss is denied, and claimant's motion to suppress is granted in part, and denied in part, for the reasons set forth below.

## BACKGROUND

By this action, the government seeks forfeiture of $191,910 on the ground that the monies represent proceeds of narcotics sales or purchases. 21 U.S.C. § 881(a)(6). At the time the money was seized, it was contained in baggage possessed by claimant Bruce Morgan, who is contesting the forfeiture. Morgan now moves to suppress all evidence stemming from the searches and seizure of the bags on the ground that such actions violated his rights under the fourth amendment. The government has filed a counter-motion seeking dismissal of Morgan's claim in the forfeiture action for lack of standing.

The underlying facts can be briefly summarized as follows. On March 14, 1990, Morgan placed his carry-on luggage, consisting of a portfolio case, a suitcase, and a soft-sided briefcase on the X-ray scanner device in the pre-boarding inspection area of San Diego Airport. He was preparing to board a flight to Oakland. The X-ray security personnel detected that Morgan was carrying a potentially large amount of United States currency and reported this to the San Diego Harbor Police. The security personnel then identified Morgan to a San Diego Harbor police officer, who approached Morgan in the boarding area. Upon questioning, Morgan stated that he was a gemologist on a business trip to buy jade and that he needed large amounts of cash. Morgan was allowed to proceed on his flight.

The police officer then contacted an agent of the San Diego Narcotics Task Force who in turn called agent Buckwalter of the San Francisco International Drug Enforcement Agency, and informed him that Morgan was enroute to Oakland.

After deplaning in Oakland, Morgan walked toward the rental car area in Oakland, where he was approached by Agent Buckwalter and another agent, who identified themselves, and asked Morgan to answer a few questions. Based on Morgan's responses, Buckwalter seized Morgan's bags, believing that he had "reasonable suspicion" to retain them so that they could be submitted to a "dog sniff" for narcotics. Buckwalter subsequently transported the bags to the San Mateo Narcotics Task Force Office in Belmont (after stopping at the San Francisco Airport to drop off another agent's car). Some time after Buckwalter arrived, he was met by Agent O'Malley and his dog, Scoop, who was to perform the dog sniff. When the dog sniff was positive, Buckwalter obtained a search warrant that evening to search the bags. A search of the bags revealed no narcotics; however, the bags contained the $191,910 in cash that is the subject of this action.

## A. GOVERNMENT'S MOTION TO DISMISS

The government moves to dismiss Morgan's claim on the ground that Morgan lacks standing to contest the forfeiture because (1) Morgan contends that he is not the owner of the money at issue, and (2) Morgan has refused to identify the owner or who he obtained the money from.

■ Neither of these reasons supports the government's motion. First, it is well established that it is not necessary for the claimant to claim ownership of the property to maintain standing under the forfeiture statute. *United States v. 1982 Sanger 24' Spectra Boat*, 738 F.2d 1043, 1046 (9th Cir.1984). A lesser property interest, such as a possessory interest is sufficient. *Id.; United States v. $5,644,540*, 799 F.2d 1357, 1365 (9th Cir.1986) (to establish standing in forfeiture action, a claimant must demonstrate an ownership *or* possessory interest in the property seized). It is clear that Morgan has a "possessory" interest be-

cause the money was seized from his bags while the bags were in his possession. *See United States v. $122,043*, 792 F.2d 1470, 1473 (9th Cir.1986); *cf. United States v. $5,644,540*, 799 F.2d 1365.[1]

■ With respect to the second ground, the government fails to cite any authority for its position that a claimant's failure to identify the source of the money precludes the claimant from contesting the forfeiture. In the absence of such authority, we decline to dismiss on this ground.

## B. MOTION TO SUPPRESS

Morgan forwards five separate grounds for granting his motion to suppress.[2] First, his luggage was subjected to an unlawful search by airport security personnel which resulted in the police being improperly alerted to the presence of cash in his luggage. Second, the stopping and questioning of Morgan outside the Oakland Airport constituted an illegal arrest. Third, the agents lacked reasonable suspicion to detain the luggage. Fourth, the delay between the time the luggage was seized and the dog sniff occurred exceeded permissible limits, and fifth, the search warrant was invalid. Each is discussed in turn.

### 1. *Airport Search*

In *United States v. Davis*, 482 F.2d 893, 910 (9th Cir.1973), the Ninth Circuit upheld warrantless, administrative, airport searches for security purposes. However, the Court recognized the danger that screening luggage for weapons and explosives could be subverted into a general search for evidence of crime, and that should such danger materialize, it would not hesitate to exclude the evidence so obtained. *Id.* at 909.

The Ninth Circuit recently revisited the issue in *United States v. $124,570*, 873 F.2d 1240 (9th Cir.1989). In that case the claimant's briefcase revealed a "dark mass" on the x-ray screen at the Seattle airport, and the scanner operator asked the claimant if she could open the briefcase. After the claimant reluctantly consented, the operator found large amounts of cash, and asked the claimant where he was headed. She then reported this information to a U.S. Customs agent. The briefcase was subsequently seized.

In suppressing the evidence from the seizure, the Court first reiterated that the validity of warrantless airport searches rests on their limited intended scope—to search for explosives or weapons. It then concluded that the search at the Seattle airport exceeded this limited scope. Specifically, the Court found that where information is passed on to authorities "pursuant to an established relationship, fostered by official policy ... [and] nurtured by payment of monetary rewards," *id.* at 1247, n. 7, then the airport search has been "effectively transform[ed] [from] a limited check on weapons and explosives into a general search for evidence of crime." *Id.* at 1257. In other words, the undisputed "established working relationship" between the x-ray scanners and law enforcement authorities at the Seattle airport had a "significant distorting effect" on airport searches, "materially altering the calculus by which we held such warrantless searches reasonable." *$124,570*, 873 F.2d at 1245.

The Court distinguished cases in which there was no indication of a cooperative relationship between airport personnel and law enforcement officials or no "investigatory police motive." *Id.* at 1247, n. 7. It

---

**1.** The parties argue over whether Morgan took the position that he was not the owner of the $191,910 in related tax proceedings in the Eastern District of California. This side dispute is irrelevant, however, since one need not be an owner to contest forfeiture.

**2.** "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 131, n. 1, 99 S.Ct. 421, 424, n. 1, 58

L.Ed.2d 387 (1978); *United States v. Giacalone*, 853 F.2d 470, 482 (6th Cir.1988), *cert. denied*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); *United States v. Feldman*, 606 F.2d 673 (6th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1648, 64 L.Ed.2d 236 (1980) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression"). Accordingly, the burden of proof rests with Morgan.

also emphasized that evidence "inadvertently discovered as part of a legitimate airport screening search" is admissible. *Id.*

Morgan contends that the airport search of his luggage was improper under *Davis* and *U.S. v. $124,570.* However, the record is largely devoid of any evidence demonstrating the type of "established working relationship" or cooperative policy that underpinned the decision in *$124,570, supra.* There is no evidence regarding such a relationship or a pattern of providing information to authorities. On the contrary, it was airport policy *not* to report any matters not relating to explosives or weapons. Florentino Depo. at 24.

While there was one notice from United States Customs (posted on a wall along with other notices), urging persons to provide certain information and offering a reward, this notice, alone, does not demonstrate the existence of an "established relationship," particularly in light of the countervailing policy testified to by Florentino.[3] Moreover, there is no evidence that Florentino ever contacted U.S. Customs; rather, she alerted the local police. Thus, it is apparent that the notice, even if read,[4] did not result in a "close working relationship" with U.S. Customs. Nor is there any evidence that Florentino was motivated by any reward or that she ever received any reward.

■ In sum, the record falls far short of showing that an established working relationship with authorities "significantly distorted" the effect on airport searches at the San Diego airport, thereby "materially altering the calculus" by which such searches have been upheld. *$124,570,* 873 F.2d at 1245.

We further note that the deposition excerpts provided to the Court (which conflict in significant respects)[5], are inconclusive with respect to whether the currency was discovered, in this particular instance, only because airport personnel continued searching after having determined that the luggage contained no explosives or other weapons. As the burden of showing that the airport search violated fourth amendment rights rests with Morgan, *see* note 2, *supra,* we resolve this factual issue against him.[6]

2. *Unlawful detention of Morgan—successive stops*

When Morgan was stopped a second time at the Oakland airport, the authorities had no more information than when he was initially stopped and questioned at the San Diego airport before boarding. Morgan contends that this type of "successive" stop, in and of itself, is so coercive that as a matter of law, the second questioning of Morgan at the Oakland Airport should be deemed an illegal arrest (since the officers lacked probable cause or a warrant).

■ However, Morgan's exclusive reliance on *United States v. Morin,* 665 F.2d 765 (5th Cir.1982), is misplaced. First, *Morin* does not, as Morgan suggests, set forth a bright line rule that a "successive" stop based on the same information necessarily renders the successive stop an illegal arrest. Rather, this was one of five factors the Court found to be relevant in determining whether an interrogation rose to the level of an arrest requiring probable cause in any particular case. *Id.* at 769. Several of these other factors entered into the Court's decision to find that Morin's fourth amendment rights were violated in that case. Finally, the continuing validity of *Morin* (never cited by the Ninth Circuit)

---

**3.** The notice from U.S. Customs is not directed to airport personnel in particular. Rather, it is directed to any person who may have information concerning a violation of customs laws. Michael Decl., Exh. J.

**4.** The deposition excerpts provided by the parties do not indicate whether Florentino was aware of the notice.

**5.** For example, Koon indicates that Florentino called for the bag check, while Florentino states that Koon called for the bag check.

**6.** We note that Morgan repeatedly emphasized that he was ultimately "cleared" for boarding. However, this fact is irrelevant to the inquiry whether the currency was discovered during a legitimate search for weapons or explosives.

is questionable given that the test employed by *Morin* is " 'no longer compatible with Supreme Court precedent.' " *United States v. Corral–Franco,* 848 F.2d 536, 540 (5th Cir.1988).

Accordingly, we decline to find that the second questioning of Morgan was unlawful based on *Morin.*

### 3. *Unlawful detention of luggage— lack of reasonable suspicion*

Morgan's next argument is that the detention of his luggage was unlawful because the agents lacked reasonable suspicion that any criminal activity may have been afoot.

In *Terry v. State of Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court held that the "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' " even if the officer lacks probable cause to arrest. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court extended *Terry* to allow a "brief" detention of a person's baggage as well. *Id.* at 706, 103 S.Ct. 2637. The *Terry* standards applicable to the detention of persons apply, *id.;* thus, the detention of Morgan's luggage is governed by the "reasonable suspicion" standard. Satisfaction of this standard requires " 'some minimal level of objective justification.' " *Sokolow,* 109 S.Ct. at 1585. While there must be more than an inchoate suspicion or hunch, the showing may fall short of probable cause, which means "a fair probability" that contraband will be found. *Id.* In determining whether the detention was supported by reasonable suspicion, the Court must look at the totality of the circumstances. *Id.*

▮▮ While the agent Buckwalter plainly lacked probable cause at the time he de-

tained Morgan's luggage, we conclude that the record demonstrates that he could have had a "reasonable suspicion" that criminal activity might have been afoot based on the following summary of Morgan's responses to agent Buckwalter's questioning:

1.  Morgan said he was in the gem business, and was flying on business, but he offered nothing to corroborate that he was in the gem business (business card, letter, pamphlet, etc.)

2.  Morgan said he had about $15,000 on him, that he was from Grass Valley, that he had gone to San Diego on business, and that he had an appointment that afternoon in Pleasant Hill, at which he was going to use the money to purchase gems. He indicated that the money was in a sealed manila envelope, which was addressed to an attorney in Nevada City. He then said he had maybe $20,000.

3.  (implied) [no item — continues]

4.  He said it was not his money, but that it belonged to the client in San Diego. Then he said it was partly his money and partly the client's.

5.  When asked why money that was to be used at the Pleasant Hill appointment was in a sealed, addressed envelope ready for mailing, Morgan said that whatever he didn't spend in Pleasant Hill he was going to send to his attorney.

6.  Morgan said he got his part of the money from his savings, and that he obtained it the other day. Then he said he got it a couple of days ago or last week, and then he said he wasn't sure when he got it.

At that point, the agent asked permission to look in Morgan's portfolio, and Morgan refused, appearing mildly agitated. The agents then detained Morgan's luggage.[7]

Morgan contends the circumstances and above exchange were inadequate to satisfy the reasonable suspicion standard, emphasizing that everything he said was "innocent" and that he did not fit the drug profile. We agree that Morgan did not fit

---

7.  There were several questions that Morgan refused to answer, such as who the gem dealer and the client were. However, as Morgan was not obligated at the time to answer any questions, we have not considered his failure to answer questions in determining whether the reasonable suspicion standard was satisfied.

the drug profile, and that each statement, taken alone, may be innocent. However, neither of these factors are dispositive. Circumstances must be viewed as a whole, and even innocent acts, taken together, may form the basis for reasonable suspicion. *Sokolow*, 109 S.Ct. at 1586–87.

Here, Morgan's explanation for carrying a large sum of cash was inherently suspicious, since he could offer no corroboration that he was in the gem business, despite representing that he was traveling on gem business. Further, it was very suspicious that the money was in an envelope addressed to somewhere else. The explanation that any "remaining" money was to be mailed to his attorney is inherently implausible as people do not generally send large sums of cash through the mail in connection with legitimate business. Further, Morgan changed his answers as questioning continued with regards to the amount of money present, who the money belonged to, and when the money had been obtained. It is particularly suspicious that Morgan stated he was carrying maybe $20,000 after saying the amount was $15,000, as it is unlikely that a person would not know, within $5,000, the amount of cash being carried for business purposes. It is also unlikely that a person on legitimate business would change his answer as to who the money belonged to and be unable to recollect when such a large sum had been obtained. Taking all the circumstances together—the implausible, evasive, and shifting answers, and the large sum of cash [8]— we conclude that the agents had a reasonable suspicion that some criminal activity may have been afoot. Accordingly, we find that the initial detention of Morgan's bags was not improper.

### 4. *Detention of Morgan's bags—excessive duration*

■ While *Place, supra,* extended the *Terry* stop doctrine to a person's luggage, the Court made clear that to comply with *Terry* the detention of the luggage must be brief. "[T]he brevity of the invasion is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." 462 U.S. at 709, 103 S.Ct at 2645; *id.* at 710, 103 S.Ct. at 2646 (police have "narrow authority" to "detain briefly luggage reasonably suspected to contain [contraband]"). The Court concluded that detaining luggage for 90 minutes before submitting it to a dog sniff test was per se unreasonable, *id.* at 710, 103 S.Ct. at 2646 (90 minute detention "sufficient to render the seizure unreasonable"),[9] but declined to specify an outside time limit. *Id.* The Supreme Court subsequently upheld a 20 minute *"Terry* stop" luggage detention in *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), because the police had acted "diligently" and the suspect's actions contributed to the delay. *Id.* at 688, 105 S.Ct. at 1576.

In addition to imposing time constraints, *Place* also emphasized that the agents had failed to accurately inform Place of the location to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangement would be made for return of the luggage if the investigation dispelled the suspicion. *Id.* Such failures, the Court stated, exacerbated the violation caused by the excessive 90 minute delay. Subsequent decisions suggest that compliance with these guidelines regarding the return of seized luggage significantly impacts the validity of a detention. *See, United States v. Erwin,* 803 F.2d 1505, 1509 (9th Cir.1986) (where agents abided by *Place* guidelines regarding return of luggage, seizure of luggage required only reasonable suspicion, not probable cause); *see also, $124,570,* 873 F.2d at 1248, n. 9; *United States v. West,* 731 F.2d 90, 92 (1st Cir.1984), *cert. denied,*

---

**8.** "Carrying a large sum of cash is 'strong evidence' [that the property is to be or was exchanged for drugs] even without the presence of drugs or drug paraphernalia." *United States v. $215,300,* 882 F.2d 417, 419 (9th Cir.1989).

**9.** *See also, id.* 462 U.S. at 709, 103 S.Ct. at 2645 ("The length of the detention of respondent's luggage *alone* precludes the conclusion that the seizure was reasonable, in the absence of probable cause") (emph. added).

469 U.S. 1188, 105 S.Ct. 956, 83 L.Ed.2d 963 (1985).

■ Here, Morgan contends that the luggage was detained for approximately two hours before being subjected to a dog sniff, and that the other guidelines concerning return of his luggage were violated as well. As discussed below, we find both of these contentions meritorious.

### Length of Detention

Agent Buckwalter's report on the incident states that the dog sniff took place at 3:20 p.m. (approximately two hours after the bags were detained at approximately 1:15 p.m.). Govt's Exh. 4. Buckwalter was present at the dog sniff. Buckwalter's affidavit in support of the search warrant, prepared the day of the seizure, also lists the time as 1520 hours. Gov'ts Exh. 5 at 6. Attached to the search warrant application is a handwritten statement by Agent O'Malley, who conducted the dog sniff, that also sets the time at 3:20 p.m. *Id.* At his deposition, Agent O'Malley again reiterated the 3:20 p.m. time for the dog sniff.

The government, however, contends that the dog sniff actually took place 45 to 60 minutes after the bags were detained (at 2:15 p.m.), based on a correction that O'Malley made to his deposition on January 17, 1991 (almost one year after the incident), wherein he states that "I wrote the statement at approximately 3:20 p.m. but I physically worked Scoop on the bags at approximately 2:15 p.m." Govt's Appendix of Deposition Testimony. The reason O'Malley provided for making the time correction was as follows: "Reason: I recalled that after working Scoop on the bags that I went into the CNTF Office to make some phone calls and to write the statement regarding the dog alert." *Id., see also,* Michael, Decl., Exh. P.

We agree with Morgan that this "correction" to O'Malley's deposition deserves little credence. Not only is it remote in time from the incident, and contradictory to all

other statements concerning the time of the dog sniff, including statements under oath, but, as counsel for the government conceded at argument, the reason given above for the time change is a non sequitur that fails to explain the basis for O'Malley's revision.

Moreover, O'Malley's subsequent efforts to justify the time change only increase its suspicious character. O'Malley drafted a separate three page statement, dated February 29 (twelve days after making the original corrections to his deposition), which gives a different reason for the time mix up: that he now remembers that he wrote the report at 3:20 p.m. because he wanted to get Scoop back to his kennel for his feeding time which usually takes place between three and four p.m. This statement, which was apparently only provided to the U.S. attorney at the time, *see* 2nd Michael Decl., again does not explain why the sniff must have been at 2:15 p.m. Presumably, even a 3:20 p.m. sniff would have enabled Scoop to arrive for a 4:00 p.m. feeding. Moreover, there is no explanation why O'Malley decided to provide an additional explanation concerning the matter twelve days after having already made and sent his corrections to the court reporter.[10]

Accordingly, we find that Morgan has demonstrated, by a preponderance of the evidence, that the dog sniff occurred at 3:20 p.m. As such, the two hour delay clearly exceeds the 90 minute delay found impermissible in *Place.*

The government argues, however, that even should we find a two hour time lapse, such lapse should not be considered fatal because the agents acted diligently and conducted the dog sniff as soon as they could. The government, however, relies on inapposite cases involving detention of mail.

Moreover, while diligence is highly relevant to disputes involving shorter detentions, *see e.g., United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) (20 minute detention),

---

**10.** O'Malley also sent a (late) one page correction to the court reporter, dated February 28, 1991, which gives the dog feeding as the reasons

for the time change. *See* 2nd Michael Decl. Again, however, there is no explanation as to what prompted this additional statement.

we read *Place* as holding that at a certain point, the time lapse becomes so excessive that the detention can no longer be justified as a "brief *Terry* stop," regardless of the officer's diligence. Thus, we conclude that the two hour delay renders the detention invalid regardless of diligence.[11]

Even assuming, however, that diligence enters into the equation, the record reflects a distinct lack of diligence in this case. The agents concerned knew that Morgan would be arriving in Oakland well before his actual arrival. Yet, the only reason O'Malley (reachable by beeper) was not at the Oakland airport or nearby was because he was "busy" practicing with Scoop in a park. He was not indisposed with another dog sniff nor acting under any constraint that would have precluded travel to the Oakland airport. Under these circumstances, it is clear that agents were not acting diligently, and that the resulting delay was clearly avoidable. Indeed, even assuming *arguendo* that the dog sniff took place at 2:15 p.m., it is questionable whether this delay would pass muster under *Place* and *Sharpe* under the circumstances presented here. *See United States v. West*, 731 F.2d 90, 92 (1st Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 956, 83 L.Ed.2d 963 (1985) ("Clearly, the government must have its dog either *at the same airport or at a similarly accessible location*, so that the dog can sniff the suspect's luggage *with dispatch*") (emph. added); *Place*, 462 U.S. at 709, 103 S.Ct. at 2645–46 (noting that the agents knew of *Place*'s impending arrival at the airport, and thus could have arranged for investigation at the airport, which would have minimized the intrusion).

Guidelines concerning return of luggage

In addition to violating the time constraints imposed by *Place*, the agents failed to comply with the Supreme Court's guidelines concerning the return of seized luggage. They did not accurately inform Morgan of the place to which they were transporting his luggage, the length of time he might be dispossessed, or what arrangement would be made for return of the luggage if the investigation dispelled the suspicion. Rather, according to Buckwalter's report and deposition all he did was provide Morgan with a telephone number where he could be reached, give him a receipt for the bags, and tell him he was "going to have the bags for a period of time." Gov'ts Exh. 4; Buckwalter Depo. at 64–65. He did not tell Morgan where he was taking the bags, *id.*, the length of time they would be detained, nor make any specific arrangements for their return.

In sum, we conclude that approximately two hours elapsed between the seizure of the Morgan's luggage and the dog sniff, and that this delay rendered the seizure invalid under the fourth amendment in light of *Place* and its progeny. As in *Place*, this violation was exacerbated by the failure to comply with *Place*'s guidelines governing the return of seized luggage. Finally, to the extent that the agents' diligence is a factor, we find that the agents were not diligent and that the circumstances did not justify the lapse of time between the detention and the dog sniff, whether it occurred at 2:15 p.m. or 3:30 p.m.

5. *Invalidity of Search Warrant*

Finally, Morgan contends that the search warrant was so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable. We need not reach this issue, given our conclusions above. However, we note that Morgan simply states that a positive dog sniff is insufficient, *by itself*, to establish probable cause. This assertion, however, is irrelevant since the warrant was not based on the dog sniff alone, but on a whole chain of events and circumstances. Moreover, courts have expressly stated that a positive dog sniff is "strong evidence" toward a

**11.** As *Place* held, the standards for detaining luggage are drawn from those applicable to *Terry* stops of individuals. No officer could hold an individual for several hours without such detention being considered an arrest, even if a showing of "diligence" could be made. Similarly, at some point, the detention of luggage becomes too long in duration to justify under *Terry* regardless of diligence. Under *Place*, that point has occurred after a 90 minute delay.

showing of probable cause. *U.S. v. $215,-300*, 882 F.2d 417, 419 (9th Cir.1989), *cert. denied*, ― U.S. ―, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990); *United States v. Quinn*, 815 F.2d 153 (1st Cir.1987). Morgan cites no authority to the contrary, and his challenge to the warrant appears meritless.

CONCLUSION

Accordingly, and good cause appearing, it is HEREBY ORDERED that:

1. The government's motion to dismiss for lack of standing is DENIED.

2. The claimant's motion to suppress is GRANTED IN PART and DENIED IN PART as set forth above. All tangible or intangible evidence seized or obtained from claimant's luggage, after it was detained by Agent Buckwalter at the Oakland Airport on March 14, 1990, is SUPPRESSED as evidence in this action. The motion is otherwise denied.

IT IS SO ORDERED.