Lauriat, J.
Michael L. Watson (“Watson”) and Thomas J. Smith (“Smith”) have each been indicted on charges of trafficking in marijuana and conspiracy to violate the Controlled Substances laws following the seizure by the Massachusetts State Police of two suitcases allegedly containing in excess of 50 pounds of marijuana from the rear seat of the defendants’ motor vehicle after it was stopped by the police in Revere, Massachusetts on March 10, 1995.
Watson and Smith have now moved to suppress from evidence at trial the two suitcases, the alleged marijuana, and all other tangible physical evidence seized from them by the police, as well as all statements made by the defendants to the police (Motions to Suppress I and II), on the grounds that (1) there was no probable cause for the warrantless search for and seizure of the suitcases, (2) there was no probable cause for the issuance of a warrant to search the suitcases at the police station after they were seized, and (3) the defendants’ statements to the police were the unlawful fruits of the illegal searches and seizures by the police.
The court conducted an evidentiary hearing on the defendants’ motions on April 3, 1996. It heard testimony from Troopers Mark E. Archer (“Archer”), Michael Velair (“Velair”), Carol Harding (“Harding”), and Reid Rideout (“Rideout”) of the Massachusetts State Police, and Elizabeth Farland (“Farland”), the Office Manager of the Holiday Inn on Route 1A in Revere. The court also received several items in evidence at the hearing, including photographs of, in and near the Holiday Inn, formerly known as the Ramada Inn, in Revere (Exhibits 1, 2, 4, 5, 6, 7 and 11), a guest folio for Room 221 at the Ramada Inn (Exhibit 3), certain airline travel documents (Exhibits 8, 9 and 10), a map of the Boston area (Exhibit 12), a Search Warrant, Application and Affidavit of Carol Harding (Exhibit 13), and a Massachusetts State Police Canine Training Program Certificate (Exhibit 14).
Upon consideration of the credible testimony of the witnesses and the exhibits presented at the hearing, the memoranda of law submitted by the parties and the oral arguments of counsel, the court makes the *294 following findings of fact and rulings of law on the defendants’ Motions to Suppress in this case.
FINDINGS OF FACT
In or about November, 1994, Harding and Archer began a “Hotel Interdiction Unit” (“HIU") within or connected to the Narcotics Investigation unit of the Massachusetts State Police. Both Harding and Archer were trained and experienced in the investigation of narcotics violations, and both had trained with the New Jersey State Police in the area of hotel drug interdiction for one week prior to their formation of the HIU. As part of their training, Harding and Archer were apprised of several “indicators” that individuals staying at hotels near airports might be engaged in illegal drug activities, including the payment of cash for a room, an indeterminate length of stay, no advance reservations, inconsistent luggage, use of pay phones or cellular phones, and use of hard-sided luggage. .
The HIU also learned that hotels at or near major airports were often used as “safe houses” by couriers or dealers who were engaged in the illegal sale and distribution of narcotics. As part of his assignment to the HIU, Archer met with the managers of several hotels located in or adjacent to Logan International Airport in order to enlist their cooperation and support in the HIU’s work.
On March 10, 1995, Archer drove to the Ramada Inn on Route 1A in Revere, just north of Logan Airport.[1] (Exhibits 1 and 2.) Upon his arrival, Archer checked the guest registration forms at the front desk looking for guests who had paid for their rooms in cash. He also looked for guests who had come from certain states known as sources of high drug activity, including California, Mexico (sic), Arizona, Texas and New Jersey, and who had registered for only one day. Archer found an individual in Room 221 who had arrived from Encinadas, California, who had paid cash for his room, and who had registered for only one day. Archer was aware that Encinadas is north of San Diego and approximately 30 miles from Mexico. He obtained a photocopy of the guest’s driver’s license, which the hotel had made when the guest checked in at about 1:30 a.m. that morning. The registration and the license identified the guest as John Graneto (“Graneto”). Archer then contacted Harding, as well as State Police Trooper Michael Velair (“Velair”) and Sergeant Michael Melia (“Melia”), and requested that they join him in surveilling the guest in Room 221. Shortly after 8:00 a.m., Archer and Harding began their surveillance in the hotel lobby, while Velair and Melia waited in their vehicles in the hotel parking lot.
At about 11:00 a.m., Archer observed an individual resembling Graneto get off the elevator in the lobby, enter the hotel restaurant, sit down and order a meal. About 11:40 a.m., Graneto left the restaurant and returned to the second floor of the hotel. At noon, Graneto again got off the elevator in the lobby, went to the front desk, gave the desk clerk cash, and returned to the second floor. Archer went to the front desk and learned that Graneto had paid for another day at the hotel. Archer also learned that Graneto who was staying in room 221, had placed two telephone calls to numbers in the San Diego, California area after his arrival at the hotel the previous evening. (Exhibit 3.)
At about 1:00 p.m., Archer and Harding observed three white males enter the hotel lobby through the rear doors. Two of the individuals were later identified as the defendants, Watson and Smith, and the third individual was later identified as Mark Curran (“Cur-ran”) . They walked to a bank of telephones in the lobby and Curran placed a call from the hotel “house” phone. The three individuals then boarded an elevator for the second floor. Archer took the stairway to the second floor, looked through a door and down the hallway, and saw the three individuals enter Room 221 at the end of the hall. (Exhibits 4, 5, 6 and 7.) Archer returned to the lobby and advised Harding of his observations. Shortly thereafter, Watson and Smith got off the elevator in the lobby. Each was pulling a large suitcase. One was black nylon and the other was blue and hard-sided. Both suitcases appeared to be heavy. At about the same time, Graneto came to the hotel lobby with Curran, checked out, called for a taxi cab, and left the hotel.
Watson and Smith went through the rear doors of the hotel into the parking lot. Archer advised Velair, Melia and Harding (who had gone to the parking lot shortly before then) of this event by radio. Harding observed Watson and Smith struggle to lift the two suitcases into the rear hatchback area of a red Eagle Talon motor vehicle. Watson and Smith, followed by Archer, Harding, Velair and Melia, then left the parking lot driving north on Route 1A.
Watson and Smith slowed and accelerated along Route 1A until making an abrupt right onto the exit ramp for Route 145 (Exhibit 11). The defendants turned right off the exit ramp and headed east on Route 145, followed by the troopers. Archer radioed for assistance from the Revere State Police Barracks, and at his request, uniformed troopers in marked cruisers stopped Watson and Smith after they had made a U-turn on Route 145 and headed west. Velair participated in the stop of Watson and Smith. After Watson, the driver, produced his license and registration, Velair ordered him out of his vehicle. Smith was also ordered out of the passenger side of the vehicle. Velair observed the two suitcases in the vehicle and asked Watson and Smith to whom they belonged. Neither Watson nor Smith claimed ownership of the suitcases.
At this point, Velair decided to seize the two suitcases and take them to the Revere State Police Barracks. Velair told Watson and Smith that they could accompany him to the barracks but that they did not have to do so. The troopers, followed by Watson and *295 Smith, drove to the barracks around 1:45 p.m. and arrived at approximately 2:00 p.m. Velair told Watson and Smith to sit on the bench in the lobby, while he took the suitcases into the office area.
Velair called for a drug detection dog to come to the barracks to sniff the suitcases for drugs, and then, after giving Watson and Smith their Miranda rights, he interviewed each of them. While neither Watson nor Smith was free to leave at that point, each volunteered statements about their actions and activities that day.
At about 3:00 p.m. that afternoon, Trooper Rideout and his dog “Roxy” arrived at the barracks and Roxy conducted a sniff search of the two suitcases. Although each suitcase was in a different room, Roxy reacted positively for drugs in each suitcase, and Rideout concluded that they probably each contained marijuana. Watson and Smith were then placed under arrest. Harding then prepared a detailed affidavit of the Troopers’ activities and observations that day, and secured a search warrant for the suitcases (Exhibit 13). At about 6:00 p.m., the suitcases were opened pursuant to the search warrant, and each was found to contain large quantities of what the troopers believed was marijuana.
After Watson and Smith were stopped by the troopers, Archer returned to the Ramada Inn, obtained the key to Room 221, which was now vacant, and searched the room for evidence. In a trash can, Archer found a one-way American Airlines ticket for Robert Swayze, from San Diego to Boston on March 9, 1995 (Exhibit 8), a travel itinerary for Robert Swayze dated March 9, 1995 (Exhibit 9), and two baggage claim checks (Exhibit 10). He advised Harding of his discoveries, and she included this information in her affidavit. Meanwhile, Archer and several other troopers attempted without success to locate Swayze and Curran at the Ramada Inn and in the nearby area.
RULINGS OF LAW
I. Stop of the Vehicle and Seizure of the Suitcases
The defendants contend that the police illegally stopped the defendants’ vehicle without having reasonable suspicion based on specific articulable facts and reasonable inferences drawn therefrom. See Commonwealth v. Wren, 391 Mass. 705, 707 (1984). “A police officer is warranted in making a threshold inquiry ‘where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime.’ ” Commonwealth v. Bacon, 381 Mass. 642, 643 (1980), citing Commonwealth v. Silva, 366 Mass. 402, 405 (1974). “(T]he police officer’s action [must] be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer’s experience.” Silva at 406. “(CJonsideration of the modes or patterns of operation of certain kinds of lawbreakers may be used as data from which a trained officer draws inferences and makes deductions — inferences and deductions that might well elude an untrained person.” Commonwealth v. Lewis, 15 Mass.App.Ct. 617, 619-620 n.2 (1983), rev. denied, 89 Mass. 1103, citing United States v. Cortez, 449 U.S. 411, 418 (1981), reh’g denied, 455 U.S. 1008.
The state troopers were aware that Graneto had arrived from Encinadas, California which is near San Diego and Mexico, source areas for drug trafficking. Graneto had placed two telephone calls to San Diego after his arrival at the Ramada Inn. He was staying at a hotel near Logan Airport, had paid for his room in cash, had registered for only one day, and then had paid for another day in cash. Based on their hotel interdiction training, the troopers concluded that Graneto fit the profile of a drug courier or dealer.
Approximately on,e hour after Graneto had paid for another day at the hotel, the police observed three men, including defendants Watson and Smith, enter the hotel, make a telephone call from the bank of phones, and then enter Graneto’s room. Watson and Smith then emerged pulling two heavy suitcases which they loaded into their car while Graneto checked out and left with Curran. At that point, the combination of circumstances, though largely innocent in and of themselves, when taken together, was sufficient to justify a Terry stop. Terry v. Ohio, 392 U.S. 1 (1968); United States v. Sokolow, 490 U.S. 1, 9-10 (1989); Commonwealth v. Fraser, 410 Mass. 541, 545 (1991). The defendants’ erratic and evasive driving only heightened the reasonable suspicion which the police already harbored. See United States v. Zapata, 18 F.3d 971, 974 (1st Cir. 1994). Cf. Wren 391 Mass. 705, 708 n.2 (1984) (attempt to avoid police cruiser).
In United States v. Place, 462 U.S. 696 (1983), the Supreme Court applied Terry principles to rule that “(g]iven the enforcement problems associated with the detection of narcotics trafficking and the minimal intrusion that a properly limited detention would entail . . . the Fourth Amendment does not prohibit such a detention.” Id. at 698. The question, then, is whether the seizure of the suitcases was a properly limited detention.
“The reasonableness of a detention of luggage for the purposes of conducting a ‘sniff test’ is dependent on the facts of each case.” United States v. West, 731 F.2d 90, 92 (1st Cir. 1984), cert. denied, 469 U.S. 1188. Relevant factors include: “1) the diligence of [the police] in pursuing their investigation so as to minimize the intrusion; 2) the brevity of the detention; and 3) the information afforded the suspect regarding the detention and return of the luggage.” Id.
The police informed the defendants that the suitcases would be taken to the State Police Barracks in Revere. Compare Place at 710. The police did not interfere with defendants’ travel plans, compare Place at 708, and the defendants were advised that they were free to leave if they did not wish to accompany the police to the barracks. See West at 91; United *296 States v. Frost, 999 F.2d 737, 739 (3rd. Cir. 1993), cert. denied, 114 S.Ct. 573. Moreover, the troopers immediately summoned Rideout and Roxy who arrived approximately one hour later to conduct the sniff-test. Although a one hour delay would be unreasonable in some cases, where, as here, the police exercised due diligence in minimizing the detention of the suitcases, such detention was properly limited. West at 93.
Defendants cite Commonwealth v. Ferrara, 376 Mass. 502 (1978), in contending that once the police had obtained a valid license and registration from Watson after stopping his vehicle, there was no basis for further interrogation. Id. at 505. The case at bar is distinguishable from Ferrara, however. In Ferrara, the warranted threshold inquiry was limited to the occupants of the vehicle and justified only reasonable protective precautions. Ibid. Consequently, once the driver had produced a valid license and registration, there was no basis for further interrogation. Ibid. See also Commonwealth v. Torres, 40 Mass.App.Ct. 6, 9 (1996). Similarly in Commonwealth v. King, 389 Mass. 233 (1991), there was no reasonable basis for further inquiry or precaution once a license and registration had been produced. Id. at 244.
By contrast, in the case at bar, there was a reasonable basis for further inquiry because the suspicion of the police extended to the luggage prior to and regardless of the vehicle stop. This suspicion warranted a threshold inquiry of the luggage based on the principles set forth in Place apart from the stop of the vehicle. Consequently, the justifiable investigation had not ended upon receipt of the license and registration. While “no amount of suspicion short of probable cause could save an exit order [to the occupants] tha.tfoU.ows the justifiable threshold inquiry,” Commonwealth v. Loughlin, 385 Mass. 60, 62 n.3 (1982), because the justifiable threshold inquiry required seizure of the luggage for the sniff-test, the exit order preceded the inquiry and was therefore proper. See id.
II. The Search Warrant
When challenging a search conducted pursuant to a search warrant, the defendant has the burden of showing that the evidence was illegally obtained. Commonwealth v. Taylor, 383 Mass. 272, 280 (1981). Defendants contend that the affidavit of Trooper Harding was insufficient to establish probable cause to issue the search warrant. This argument is without merit.
The affidavit set forth Harding’s experience as a narcotics investigator, the training which she and Archer had received in hotel interdiction, and a detailed account of the troopers’ observations. The affidavit established that Trooper Rideout was an experienced K9 officer, and that his dog Roxy[1] had conducted more than 200 searches, was certified as a drug detecting dog in February 1995 after two months training, and had alerted to both suitcases indicating the presence of marijuana. This information was sufficient to establish probable cause to issue the warrant. See United States v. Maldonado-Espinosa, 968 F.2d 101, 103 (1st Cir. 1992), cert. denied 113 S.Ct. 1579 (positive dog sniff provides probable cause to obtain warrant to search luggage). See generally Commonwealth v. Cefalo, 381 Mass. 319, 328-30 (1980); G.L.c. 276 §2B.
III. The Defendants’ Statements
The defendants also seek to suppress their statements as the fruits of an illegal seizure of defendants’ vehicle and the two suitcases. See Wong Sun v. United States, 371 U.S. 471 (1963). As this court has already ruled that the stop of the automobile and the seizure of the suitcases was proper, this argument fails.[2]
The defendants have not asserted that the statements which they made while stopped on Route 145 were the product of a custodial interrogation -without Miranda warnings. See Arizona v. Miranda, 384 U.S. 436 (1966); Commonwealth v. Bryant 390 Mass. 729, 736-37 (1984). However, because this court has concluded that defendants were not in custody until they had been advised of their Miranda rights at the State Police Barracks, such an argument would fail.[3] Cf. Commonwealth v. Ayre, 31 Mass.App.Ct. 17, 19-21 (1991), rev. denied 411 Mass. 1101 (brief detention of defendant for investigative inquiry did not constitute custody and require Miranda warnings). Further, after defendants had been advised of their Miranda rights, each voluntarily, knowingly, and intelligently waived those rights and voluntarily gave statements to the police at the Revere State Police Barracks. See Commonwealth v. Williams, 388 Mass. 846 (1986).
ORDER
For the foregoing reasons, the Motions to Suppress I and II brought by defendants Michael Watson and Thomas J. Smith are DENIED.

 After the events at issue in this case, the owners of the hotel changed their franchise affiliation from the Ramada Inn to the Holiday Inn.

The affidavit misnamed the dog as Maxie. However, “[f]actual inaccuracies not going to the integrity of the affidavit do not destroy probably (sic) cause for a search.” Commonwealth v. Murray, 359 Mass. 541, 548 (1971).

If the stop of the vehicle and the seizure of the luggage were illegal, then defendants’ statements would be suppressed as the fruit of an illegal stop because there was no independent basis for the interrogation.